# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**MARY A. HARRIS,**
**Personally and as Special**
**Administrator of the Estate**
**of Edward Harris, deceased,**

**Plaintiff,**

v.

**Case No. 06-C-0230**

**DAVID A. CLARKE, JR.,**
**MILWAUKEE COUNTY,**
**ROY TROUTMAN, M.D.,**
**GAIL SZCZEPANIAK, R.N.,**
**WILLIAM BROWN,**
**ROBERT DICKERSON,**
**CATHERINE TRIMBOLI,**
**ANN DUNN, and**
**SUE SINGER,**

**Defendants.**

---

# DECISION AND ORDER

---

Edward Harris ("Edward")[1] was a pretrial detainee at the Milwaukee County Jail

("Jail") in Milwaukee County ("County"), Wisconsin from September 29, 2004, until October

14, 2004, when he died of a pulmonary embolism – blood clot relating to the lungs. His

---

[1]Because Edward and the Plaintiff have the same surname, the Court departs from its usual practice of referring to individuals by their surname. Rather, the Court has referred to Edward by his given name and the Plaintiff by her surname.

Other persons involved in this action also have a surname in common. The Court has referred to one person by the surname and any others having that surname by their given name.

In some instances, the information before the Court includes an incomplete name. Therefore, the Court has referred to the individual by the name provided.

No disrespect is intended by any of these reference devices.

widow, Plaintiff Mary A. Harris ("Harris"), personally and as special administrator of the Estate of Edward Harris, deceased, brings the action against Defendants David A. Clarke, Jr. ("Clarke"), the County, Roy Troutman, M.D. ("Troutman"), Gail Szczepaniak, RN ("Szczepaniak"), William Brown ("Brown"), Robert Dickerson ("Dickerson"), Catherine Trimboli ("Trimboli"), Ann Dunn ("Dunn"), and Sue Singer ("Singer") (collectively the "Defendants"). Harris has sued the Defendants in their individual and official capacities.

The amended complaint alleges a Fourteenth Amendment claim of deliberate indifference under 42 U.S.C. § 1983 against all the Defendants (first claim); and negligence claims against Clarke (second claim); Defendant Monica Pope-Wright ("Pope-Wright") (third claim),[2] Troutman (sixth claim); Szczepaniak (seventh claim); Brown (eighth claim); Dickerson (ninth claim); Trimboli (tenth claim); Dunn (eleventh claim); and, Singer (twelfth claim). Harris also alleges a claim for loss of society and companionship (fourth claim) and negligent infliction of emotional distress (fifth claim) against all the Defendants.

The Court has subject matter jurisdiction over Harris's § 1983 claims pursuant to 28 U.S.C. § 1331. Supplemental jurisdiction over Harris's state law claims is afforded by 28 U.S.C. § 1367. Venue is this district is proper under 28 U.S.C. § 1441.

Presently before the Court are the Defendants' motions for summary judgment dismissing the action and to exclude the testimony of Basil Jackson, M.D., J.D. ("Jackson").

---

[2]On March 20, 2006, this Court entered an order pursuant to the stipulation of the parties dismissing Pope-Wright from this action on the merits, with prejudice and without costs to either party. However, the Court's order did not mention the third claim for negligence against Pope-Wright. The Court now expressly dismisses the third claim related to Pope-Wright.

Harris opposes both motions. The briefing of the motions is complete and they are addressed herein.

## MOTION TO EXCLUDE EXPERT TESTIMONY OF JACKSON

Pursuant to Rules 702 and 104(a) of the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Rules 16(c)(2)(D) and 26(a)(2) of the Federal Rules of Civil Procedure, the Defendants seek an order excluding the expert testimony and opinions of Jackson on the issues of the cause of death and medical care provided to Edward and Harris's allegations of deliberate indifference to Edward's medical needs by the County Sheriff's Department ("Sheriff's Department"). The Defendants argue that Jackson is not qualified to offer most of the opinions expressed in his reports. Specifically, they maintain that he is not qualified to opine on the medical care provided to Edward by the Sheriff's Department, its officers, and medical staff following Edward's arrest and the cause of Edward's death. By Jackson's own admission, he is not qualified to render an opinion on the latter.

Harris disagrees and maintains that Jackson is more than qualified to provide the expert opinions set forth in his reports and that his opinions meet the requirements of Rule 702.

Rule 702 has been amended to reflect the Supreme Court's decision in *Daubert*. *See* Fed. R. Evid. 702, 2000 advisory committee note. Expert testimony is admissible if offered by "a witness qualified as an expert by knowledge, skill, experience, training, or education," and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony

3

is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. *See United States v. Conn,* 297 F.3d 548, 555 (7th Cir. 2002). The trial court's basic "gatekeeping" obligation applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The proponent of the expert testimony "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702 advisory committee's note, 2000 Amendments ¶ 1 (interpreting Fed. R. Evid. 104(a)). *Daubert* held that the trial courts must function as a "gatekeeper" to ensure that the offered expert testimony is both relevant and reliable. 509 U.S. at 589. The court of appeals for this circuit has interpreted *Daubert* to require trial courts to employ a two-step methodology when determining the admissibility of proffered expert testimony. *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 344 (7th Cir. 1995). First, the district court must determine whether the testimony has been subjected to the scientific method; in other words, it must exclude testimony based on "subjective belief or unsupported speculation." *Id*. (quoting *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)). Second, the trial court must determine whether the testimony has a sufficient nexus with the facts of the case and with the relevant inquiry that it will actually assist the trier of fact in understanding the evidence and performing its function as fact-finder. *Id*.; *see Daubert*, 509 U.S. at 591-92.

*Daubert* sets forth a nonexclusive list of factors or guideposts that a court should consider for this analysis: (1) whether the theory can be and has been verified by the scientific method through testing; (2) whether the theory has been subjected to peer review; (3) the known or potential rate of error; and (4) the general acceptance of the theory in the scientific community. *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996). It is incumbent upon the trial court to carefully consider these factors before admitting any expert scientific evidence. The *Daubert* test is a flexible one and there is no requirement that an expert's testimony satisfy each of the listed factors. *United States v. Vitek Supply Corp.*, 144 F.3d 476, 485 (7th Cir. 1998).

While Jackson vacillated in his criticisms of aspects of the individual treatment of Edward, ultimately he finds no fault with the care provided by any individual. Rather he believes that Edward should have been cared for in a clinical psychiatric facility and not in the County Jail.

Jackson is a licensed psychiatrist in Wisconsin. Jackson has practiced psychiatry for more than 50 years and is board certified in psychiatry, child psychiatry, and forensic psychiatry. He has a long list of professional experience which includes founding the mental health department at St. Francis Hospital in Milwaukee, Wisconsin and serving as its medical director. He also founded the mental health department at the former Lutheran Hospital serving as its chief of psychiatry, and founded the Wisconsin School of Professional Psychology. He has served as an associate clinical professor of psychiatry at the Medical College of Wisconsin and, its predecessor, the Marquette School of Medicine. From 1991 to

1996 he was a psychiatric consultant to the Milwaukee County Sheriff's Department, and served the Milwaukee County Circuit Court in that capacity. He currently sees patients in clinics in the Milwaukee area, Fond du Lac, and Juneau, Wisconsin. Jackson is qualified by education and experience as a psychiatric expert.

At his June 1, 2007, deposition, Jackson admitted that he is not a pulmonologist or a forensic pathologist and considers neither area as part of his expertise. Additionally, Jackson had not been to the infirmary or the Special Needs Unit ("Special Needs") at the Jail, has never toured the Jail complex and has no specialized training in the care of incarcerated individuals. Jackson's reports state that his opinions are based on his review of Edward's medical, jail, and police records and a personal interview of Harris.

While Jackson has expertise in psychiatry, he is not a pulmonologist or a forensic pathologist and therefore is not qualified to render an opinion on the development of the  pulmonary embolism or the cause of Edward's death.

Harris argues that even though Jackson has not visited the Special Needs or the infirmary, where Edward was confined, his review of the Jail and medical records, which disclose the treatment afforded Edward provide an appropriate basis for an expert opinion and render it admissible. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000).

The Defendants respond that Jackson made no efforts to determine the care being given to Edward and that he has essentially ignored or failed to obtain the facts necessary to determine the level of care that Edward was receiving. Ergo the fundamental flaw of Jackson's opinions is that they are not based on the facts of this case.

Opinions must be grounded in the scientific method, which requires that the judge determine whether the evidence is genuinely scientific, as distinct from unscientific speculation offered by a genuine scientist. *See Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). "An 'opinion has a significance proportioned to the sources that sustain it.' An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999) (quoting *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) (internal citation omitted)).

Jackson's written reports dated February 27, 2007, and January 3, 2008, identify his observations and concerns regarding the quality of care provided to Edward. They outline actions which he states should have been taken to provide Edward with a reasonable degree of medical care. (Defs.' Master Ex. List ¶ 6, Ex. 6B 2.) Jackson's January 3, 2008, report states that, in his medical and psychiatric opinion, hospitalization in a secure psychiatric facility, with appropriate medical care, was indicated from the time Edward was admitted to Jail. (Defs.' Master Ex. List ¶ 6, Ex. 6C 4.)

Jackson opined that the most important details of Edward's history should have been obtained immediately from Bell Therapy ("Bell"), which had been providing psychiatric treatment for Edward, immediately upon incarceration on September 24,[3] and yet they were not received until October 2, over a week later, and were not stamped received by Troutman until October 5. Jackson stated that in a clinical psychiatric facility they would have been

---

[3]This date is in error. Edward was not in the custody of the jail until September 29, 2004.

requested on admission and reviewed immediately. (Defs.' Master Ex. List ¶ 6, Ex. 6B 2, 6C 2-3.)

At his deposition, Jackson was asked to state his understanding of how the Jail obtained a history regarding Edward. (Defs.' Master Ex. List ¶ 6, Ex. 6 46.) He testified:

> Well they did an initial assessment. Of course, they did not get any information from him. They . . . At least one person talked to his wife. Froedert [Hospital] got more information from his wife. Then they requested the previous medical records from Bell, which did not come for quite a while, maybe a week, then apparently [it] was a week later that Dr. Troutman got them. So that gives me a lot of concern.

(Defs.' Master Ex. List ¶ 6, Ex. 6, 46.) Further questioning resulted in Jackson also stating that he understood that Troutman and his staff had contacted Bell on September 29th to get an oral history. (Defs.' Master Ex. List ¶ 6, Ex. 6, 46-47.)[4] Jackson's initial position that the records were not obtained for "quite a while perhaps a week," is not grounded in the facts. The record establishes that a seven-page fax from Bell reflecting Edward's medical record was received by the Jail on September 29, 2004.

Jackson opined that on September 24, 2007,[5] a neuropsychiatric check every six hours was inadequate in view of Edward's current state and the available history. He indicated that in a psychiatric facility even the healthiest patient is routinely checked more than this. He stated that a minimum of 15 minute checks should have been ordered in the interest of Edward's safety and, at times, continuous observation. (Defs.' Master Ex. List ¶ 6, Ex. 6C

---

[4]This "fact" is not in the proposed findings of fact submitted by the parties in conjunction with the Defendants' summary judgment motion.

[5]Jackson's date is incorrect. The correct date is September 29, 2004.

2; *see also* Ex. 6B 2.) When asked what he meant by monitoring, Jackson testified: "Observing and doing what is called for on the basis of your observation." (Defs.' Master Ex. List ¶ 6, Ex. 6, 56.) When asked whether monitoring meant taking vital signs every 15 minutes, Jackson responded: "No. I mean just being sensitive to the total phenomenological status of the individual. Whether that means touching, whether it means just eyeballing, whatever is required." (Defs.' Master Ex. List ¶ 6, Ex. 6, 57.)

Jackson's opinion does not take into account, that the record establishes Special Needs, where Edward was confined between September 30, and October 7, 2004, and briefly on October 12, 2004, after returning from Froedert, is a horseshoe-shaped unit that contains 19 single inmate cells with glass doors. The unit is designed so that two or three deputies can view each inmate from the central control section through glass. Deputies are at the control center 24 hours a day, seven days a week. Troutman and Dunn could "eyeball" the inmates in Special Needs frequently. (*See* Defs.' PFOF ¶ 286, Pl.'s Resp. Defs.' PFOF ¶ 286.) Jackson's opinion regarding the deficiencies in the staff's ability to observe Edward during his initial confinement does not fit with the facts of this case.

Despite Jackson's opinion about the need for constant monitoring, he also did not know the last time that Edward was seen by Jail staff prior to his death. (Defs.' Master Ex. List ¶ 6, Ex. 6, 76-77.) The record establishes that Nurse Ed Finch ("Finch") observed Edward about ten minutes before his death.

Jackson also opined that permitting Edward to lie on a cold floor was the opposite of adequate psychiatric care and would not have been permitted in a clinical

9

psychiatric facility and would have never been permitted even if it meant that Edward had to be restrained in his bed.  (Defs.' Master Ex. List ¶ 6, Ex. 6C 3; *see also* Ex. 6B 3.)  However, when Jackson was asked how many times the Jail staff used restraints on Edward, he responded: "I'm not sure."  (Defs.' Master Ex. List ¶ 6, Ex. 6, 62.)  Jackson also did not know how frequently Edward was laying on the floor, or for how long a period.  (Defs.' Master Ex. List ¶ 6, Ex. 6, 63, 76-77.)  When asked how he knew that the floor in the Special Needs or the infirmary was cold, Jackson responded that he had been to the Jail and that he doubted that one floor was much different than another.  (Defs.' Master Ex. List ¶ 6, Ex. 6, 77.)

Jackson's opinions about the type of care provided at the Jail are not sufficiently linked to the facts of this case to be reliable.  Therefore, the Defendants' motion to exclude Jackson's opinions related to the care rendered to Edward at the Jail and the cause of Edward's death are excluded from the record in this matter.  His opinion that a clinical psychiatric setting would have afforded better treatment for Edward would not aid the trier of fact in this case.

The Defendants' motion to exclude the testimony of Jackson does not address his opinions regarding Harris.  Those opinions are based on two interviews that Jackson had with her on February 23, and December 20, 2007.  Jackson interviewed her in an attempt to evaluate any impact which she may have experienced following Edward's death.  (Defs.' Master Ex. List ¶ 6, Ex. 6C, 10.)  Those opinions are not excluded under this Court's ruling.

## SUMMARY JUDGMENT MOTION

In deciding the Defendants' motion for summary judgment, the Court applies the following standards. When considering a motion for summary judgment, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248; also citing *Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *United States v. Rode Corp.*, 996 F.2d 174, 178 (7th Cir. 1993)).

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

Case 2:06-cv-00230-RTR   Filed 11/10/08   Page 11 of 79   Document 133

Failure to respond to a summary judgment motion does not automatically result in judgment against the non-moving party. *See Cunningham*, 30 F.3d at 883. "A party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* (citations omitted).

## RELEVANT FACTS[6]

### The Parties

Harris is a resident of Wisconsin. Clarke, a resident of the County, has been employed by Sheriff's Department at all times relevant to the complaint. The County is a body corporate organized pursuant Wis. Stat. § 59.01.

Troutman, a resident of the County, has a B.S. in Zoology from Fort Valley State in Fort Valley, Georgia, and obtained his medical degree in 1979 from the Medical College of Wisconsin ("Medical College"), which is located in Milwaukee, Wisconsin. Troutman then completed an internship and psychiatry residency at the Medical College and served as an Assistant Clinical Professor at the Medical College's Department of Psychiatry and Behavioral Medicine. Troutman is not board certified.

Troutman also worked as a general psychiatrist at the County Mental Health Complex's Metro North Community Health Clinic from July 1983 until August 1999, and at

_____

[6]Unless otherwise stated, the relevant facts are based on the Defendants' proposed findings of fact ("Defs.' PFOF"), Harris's additional proposed findings of fact ("Pl.'s PFOF"), and the Defendants' Supplemental Proposed Findings of Fact, to the extent they are undisputed. Citations to quoted excerpts are included even if they are undisputed.

Case 2:06-cv-00230-RTR   Filed 11/10/08   Page 12 of 79   Document 133

the County Health Services from September 1999 through August 2001. Troutman is licensed by the State of Wisconsin and had that license in 2001.

From November 2001 to August 2006, Troutman was employed at the County Jail ("Jail"). In 2001, when Troutman began working at the Jail, he had about two hours of on-the-job training. Troutman's regular schedule at the Jail was ten hours a day, Monday through Thursday. Prior to 2001, Troutman had worked on loan to the Jail from the County Behavioral Health Complex ("Behavioral Health"). Troutman is currently retired.

At his February 1, 2008, deposition, Troutman testified that the only time he would act to transfer an inmate to Behavioral Health or another mental health facility is upon the inmate's release from custody. Troutman stated that Special Needs "is the mental hospital." (Defs.' Master Ex. List ¶ 13, Ex. 13 61.) Troutman testified that there never was an occasion where he would deem an inmate under his care so mentally ill that he was not appropriately housed in Special Needs. Troutman testified that he believes that one should not send "people who have committed crimes to a hospital with people who have not done that." (Defs.' Master Ex. List ¶ 13, Ex. 13 133.)

Szczepaniak, a Washington County, Wisconsin resident, is a registered nurse in Wisconsin who has been practicing for 30 years. She was employed at the Jail as a staff nurse from April of 2004 to March of 2006. She is currently employed at Behavioral Health.

Brown is a resident of the County, who served as a correctional officer at the County House of Correction ("House of Correction") from June of 1991 through January of 1998. Brown was certified to become a law enforcement officer with the State of Wisconsin

on January 9, 1998, and he was first employed by the Sheriff's Department in January of 1998. In March of 2000, Brown was certified as a deputy for the Patrol Division by the Sheriff's Department. Brown was employed as deputy sheriff on September 29, 2004.

Dickerson, who was employed by Racine County, Wisconsin ("Racine") as a correctional officer from 1999 to 2000, was first employed by the County as a deputy sheriff and a correctional officer from January of 2000 through 2003. Dickerson worked in Special Needs between January of 2000 through 2003. Dickerson was employed as a deputy sheriff with the Sheriff's Department Patrol Division ("Patrol Division") from 2003 until 2004 or 2005, and was employed in that capacity on September 29, 2004. Dickerson is currently employed as a canine patrol officer with the Everest Metropolitan Police Department.

Trimboli was employed as a correctional officer at the House of Correction from 1994 to 1996. She began her employment as a deputy sheriff with the Sheriff's Department in 1996. Trimboli has been assigned to the Patrol Division from 2002 through at least July 15, 2008,[7] and was so employed on September 29, 2004, when she was working an alcohol grant squad[8] on Interstate Highway 94 in the County.

Dunn is a psychiatric nurse practitioner who was employed as a nurse practitioner at the Jail from October 2003 through August 2006, and at all times relevant to this complaint. Dunn's regular schedule at the Jail, was 7:30 a.m. through 4:00 p.m., Monday

---

[7]July 15, 2008, is the date that the Defendants filed their motion for summary judgment and supporting documents.

[8]Alcohol grant squads are funded grants from the State of Wisconsin. (Defs.' Master Ex. List, ¶ 12, Ex.12 (Trimboli Dep. 7)). The primary goal of the squads is to get impaired drivers off the freeway. (*Id.*) Officers in the squads make traffic stops alone. (*Id.*)

14

through Friday.  Dunn is currently employed as a nurse practitioner at Behavioral Health's central walk-in clinic.

Singer, a resident of Waukesha County, Wisconsin, is currently retired.  From 1973 to 1995, Singer was employed as a nurse at Doyne Hospital in Wauwatosa, Wisconsin ("Wauwatosa") and from December of 1995 until January of 2005, she was employed by the County as a registered nurse at the Jail.  From 1995 to 2002, she worked as a staff nurse and from 2002 until sometime in 2004, she worked as the nurse educator.[9]  Singer worked as acting director of nursing from July or August in 2004 until Pope-Wright was hired.  Singer was also a member of the Quality Assurance Improvement Committee.  As nurse educator, she was responsible for overseeing the training of nurses employed at the Jail, including training the nurses on Jail policies and procedures.

### Edward's Medical and Psychiatric History

Edward's psychological problems began during 1977.  He was formally diagnosed as paranoid-schizophrenic in 1985.  He was treated as an inpatient several times when he did not take his psychotropic medications and engaged in dangerous behavior: twice in 1980; once in 1981 at Kenosha Memorial Hospital; twice in 1985; once in 1992 at Mendota Mental Health Institute; and in 1995 when he was placed under protective services pursuant to Chapter 51 of the Wisconsin Statutes.

---

[9]Paragraph 44 of the Defendants' proposed findings of fact states that from 2002 to 2005, Singer was the nurse educator at the Jail.  That statement, which Harris did not dispute, conflicts with the Defendants' response to paragraph 96 of Harris's additional proposed findings of fact which states that Singer worked as a nurse educator until December 2004, when Pope-Wright took the position.  Review of page seven of Singer's deposition, cited in support of both the Defendants' contentions, discloses that Singer testified that she was acting director of nursing, not the nurse educator, from July or August 2004 until Pope-Wright began her employment and that Singer could not recall Pope-Wright's start date.  The Court has modified the factual statement to be consistent with the cited factual information.

In October 1999, Edward caused two consecutive motor vehicle accidents. He was committed for evaluation and found guilty but not mentally competent and placed on a Wis. Stat. § 971.17[10] restriction to comply with all medications as prescribed. Through the Wisconsin Department of Health and Family Services, he was placed on the conditional release program and also put on probation.

As of January 10, 2003, Edward was assessed by Bell as a part of their provisional treatment plan. At that time his diagnosis was Axis I:[11] Schizophrenic, paranoid 295.30,[12] Alcohol Dependence in remission, Axis II: Deferred, Axis III: History of Hypertension, Axis IX: Outsiders interfering with his personal life, and Axis V: 60.[13] It was further noted that Edward lacked insight into his mental illness causing him to discontinue his medications when he was not under some type of commitment.

_____

[10]Wisconsin Statute § 971.17 governs the procedures for commitment and release of persons found not guilty of crimes by reason of mental disease or defect.

[11]Psychiatric diagnoses are analyzed using the multiaxial approach of the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revision, ("*DSM-IV-TR*") (4th ed. 2000). There are five axes in the DSM-IV multiaxial classification: Axis I assesses clinical disorders and other conditions that may be a focus of clinical attention; Axis II assesses personality disorders and mental retardation; Axis III assesses general medical conditions that may be relevant to the management of the patient's mental disorder; Axis IV assesses psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders; and Axis V is a numerical score that reflects the clinician's judgment regarding the individual's overall level of functioning, termed the Global Assessment of Functioning ("GAF"). *DSM-IV-TR* 27-33.

[12]The number 295.30 is the *DSM-IV-TR* code for a type of Schizophrenia in which there is the presence of prominent delusions or auditory hallucinations in the context of a relative preservation of cognitive function and affect and the following characteristics are not prominent: disorganized speech, flat or inappropriate affect, or disorganized or catatonic behavior. *DSM-IV-TR* 313. Catatonia is the phase of schizophrenia in which a patient is unresponsive, marked by the tendency to assume or remain in a fixed posture and the inability to move or talk. *Taber's Cyclopedic Medical Dictionary* 357 (20th ed. 2005).
The *DSM-IV* is the most widely used psychiatric reference book in the world, according to its publisher, the American Psychiatric Association.

[13] A GAF of 60 represents symptoms that present moderate difficulty in social, occupational, or school functioning. *DSM-IV* 34.

16

According to a September 2004, medication chart from Bell, psychiatrist Dr. Roerich[14] ("Roerich") prescribed Fluphenazine[15] 25 mg IM (intramuscular) every three weeks for Edward. It was administered to Edward on September 7, and September 28, 2004. Edward was due to receive the next dose on October 19, 2004.

During Edward's 27-year history of psychotic episodes prior to September 29, 2004, he had attempted suicide by self-immolation and had at least six contacts with law enforcement agencies.

Edward was provided medical care at the Jail from September 30, 2004, to October 7, 2004. He received medical care at Froedert Memorial Hospital ("Froedert") from October 7, through October 12, 2004. After being discharged from Froedert on October 12, 2004, until his death in October 14, 2004, due to a pulmonary embolism, Edward received medical care at the Jail.

### Events of Thursday,[16] September 29, 2004

At 22:10, Edward, who was driving a red General Motors Corporation pickup truck, led Racine County Deputy Sheriffs on a chase through the Mitchell interchange, driving erratically and reaching speeds of nearly 100 miles per hour. As Edward entered the County,

---

[14]Dr. Roerich's given name is not included in the proposed finding of fact (Defs. PFOF ¶ 49) or in the cited exhibit.

[15]Fluphenazine is an antipsychotic medication used to treat schizophrenia and psychotic symptoms such as hallucinations, delusions, and hostility. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682172.html (last visited October 20, 2008). A brand name for the drug is Prolixin Decanoate. *See id.*

[16]Because the days of the week for the relevant dates in 2004 provide some helpful context for the events, the Court has added them to the relevant facts.

County Deputy Sheriffs joined the pursuit to follow what they believed was an intoxicated driver.

During the pursuit in the County, Edward was observed operating his motor vehicle at a high rate of speed, speeding up and slamming on his brakes, and driving in more than one travel lane. When Edward sped through the Zoo interchange, a moving road block was established. Edward struck one of the squad cars during the pursuit.

During the process of taking Edward into custody, he refused commands to exit his vehicle. He also resisted attempts to place him in handcuffs. After Trimboli gave Edward angle kicks to his abdomen and Brown used O.C. spray (O.C. is the abbreviation for oleoresin capsicum - the active ingredient in cayenne pepper – O.C. spray is commonly referred to as mace), Edward was decentralized and taken into custody.

Brown did not observe any sort of odor of intoxicants or drugs on Edward at the time of his arrest. Trimboli did not observe a smell of alcohol on Edward and he did not appear to be impaired. Dickerson did not recall whether Edward appeared intoxicated when he was arrested.

The incident report, MCTY0067, which is part of Edward's Jail medical record includes details regarding the arrest including that Edward was forced to the ground, pressure points were used to gain compliance, several focused strikes were made to Edward's arm area, and O.C. spray was used. (Defs.' Resp. Pl.'s Add'l PFOF ¶ 22.)

Brown was not and is not aware of Edward's past contacts with the law. Trimboli did not run a "NCIS" or a "CIB" check on Edward because that was not required

since she was not the arresting officer. (Defs.' Resp. Pl.'s Add'l PFOF ¶ 23.) Dickerson did not run a "CIB" check or a background check on Edward. (Defs.' Resp. Pl.'s Add'l PFOF ¶ 23.)[17]

At 22:40, Wauwatosa Rescue Squad # 3 arrived at the scene to flush the O.C. spray from Edward's eyes. Edward refused all emergency medical services and the unit was cleared at 22:50.

At the time of the arrest, Trimboli did not observe that Edward was a danger to himself or others. At the time of Edward's arrest, Brown did not believe that Edward was a danger to himself or others. Brown conveyed Edward to Jail.

Following the arrest, Trimboli, Brown, and Dickerson completed "Use of Force" summary reports which were approved by their supervising officers.

At 23:20, Szczepaniak attempted to perform an initial medical screening on Edward at the Jail. She noted he was alert, moved all extremities, and was not complaining of any discomfort, but he was agitated and arguing with deputies. Edward had mild abrasions on his forehead and right middle finger. Szcezpaniak performed a minor physical examination of Edward during booking. (Defs.' Master Ex. List ¶ 10, Ex. 10 (Szcezpaniak Dep.) 10.) The booking room is a large open room. As a result because of privacy concerns, minor physicals are performed. (Defs.' Master Ex. List ¶ 10, Ex. 10 10.) Edward refused to answer questions.

---

[17]Harris's proposed additional finding of fact paragraph 24 regarding the Racine County Sheriff's Department obtaining information regarding Harris's history, citing MCTY 1469, is contested by the Defendants. The underlying document is not a part of the parties' summary judgment submissions. The proposed fact has not been included in the relevant facts because it is contested and is not supported by the documentary evidence submitted on summary judgment. *See* Civil L.R. 56.2(a) (E.D. Wis.).

Edward was to be kept in an open waiting area until he was further evaluated by medical personnel.[18]

At some time during the arrest and the booking process, Brown identified Edward as an "emotionally disturbed person," but he did not relay that information to Szczepaniak during the booking process. Brown testified at his May 8, 2008, deposition that an emotionally disturbed person is someone that does not have the capacity to function in a normal setting.

At his deposition, Brown testified that in the booking room, he related the medical issues to Szczepaniak, informing her that Edward had been sprayed with O.C. spray, Brown had used strong side knee strikes into Edward's lower abdominal area, and Edward had refused O.C. aftercare from the Wauwatosa Fire Department. Brown testified that he did not provide Szczepaniak with copies of the use of force report because arresting officers are not required to by their agency. Szczpaniak's notes do not record that Brown conveyed the information about the use to force to her.

Clarke testified that arresting officers who use force must report it to the booking nurse if there is a medical reason to do so but it is not necessary in all circumstances. Clarke testified that he "wouldn't always expect the deputy's going to tell them, . . . I used a compliance hold. But if he's unconscious I would." (Patterson Aff. ¶ 9, Ex. 9 (Clarke Dep.) 49.)

---

[18]There is a factual dispute between the parties regarding whether Edward was to be kept in the open waiting area until he was seen by a psychiatrist and an adult nurse practitioner or whether he was to be seen by a psychiatric nurse practitioner, not a psychiatrist. (*Compare* Defs' PFOF ¶ 62; Pl's Resp. Defs.' PFOF ¶ 62.)

# Events of Friday, September 30, 2004

At 00:02 Steve Stetka ("Stetka") of the Racine Sheriff's Department Unit/Station 5055 sent a fax transmission to the Jail indicating that day Edward had not taken his medications. The listed medications and dosages are: Ecotrin[19] 500 mg, one per day; Furosemide 20 mg,[20] one per day; Diovan 320 mg,[21] one per day; Coreg 25 mg,[22] one twice a day; Norvasc 10 mg,[23] one per day; and, Zocor 80 mg,[24] one per day at bedtime.

At 01:30 and 03:15, additional attempts were made to complete Edward's health screening. He continued not to answer health questions.

---

[19]A brand name for Aspirin.

[20]Furosemide, a 'water pill,' is used to reduce the swelling and fluid retention caused by various medical problems, including heart or liver disease. It is also used to treat high blood pressure. It causes the kidneys to get rid of unneeded water and salt from the body into the urine. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html (last visited October 20, 2008).

[21]Diovan contains hydrochlorothiazide and valsartan. Valsartan is used alone or in combination with other medications to treat high blood pressure. Valsartan is also used to treat heart failure in people who cannot take angiotensin-converting enzyme (ACE) inhibitors. Valsartan is in a class of medications called angiotensin II receptor antagonists. It works by blocking the action of certain chemicals that tighten the blood vessels, so blood flows more smoothly. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697015.html#why (last visited October 20, 2008).
Hydrochlorothiazide, a 'water pill,' is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease. It causes the kidneys to get rid of unneeded water and salt from the body into the urine. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (last visited October 20, 2008).

[22]Coreg is brand name for carvedilol which is used to treat heart failure (condition in which the heart cannot pump enough blood to all parts of the body) and high blood pressure. It also is used to treat people whose hearts cannot pump blood well as a result of a heart attack. Carvedilol is often used in combination with other medications. Carvedilol is in a class of medications called beta-blockers. It works by relaxing the blood vessels to allow blood to flow through the body more easily. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697042.html (last visited October 20, 2008).

[23]Amlodipine is used alone or in combination with other medications to treat high blood pressure and chest pain (angina). Amlodipine is in a class of medications called calcium channel blockers. It lowers blood pressure by relaxing the blood vessels so the heart does not have to pump as hard. It controls chest pain by increasing the supply of blood to the heart. If taken regularly, amlodipine controls chest pain, but it does not stop chest pain once it starts. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html (last visited October 20, 2008).

[24]Zocar is a brand name for simvastatin which is used together with lifestyle changes (diet, weight-loss, exercise) to reduce the amount of cholesterol (a fat-like substance) and other fatty substances in the blood. Simvastatin is in a class of medications called HMG-CoA reductase inhibitors (statins). It works by slowing the production of cholesterol in the body. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030 (last visited October 20, 2008).

Between 04:00 and 04:45, Edward returned from booking and was kept in an open waiting area while the staff attempted to obtain answers to the medical screening questions.

Szczepaniak was able to perform a neurological assessment, and evaluated Edward in at least 14 different areas. She noted that Harris had abrasions on his forehead, elbows, and hands. Szczepaniak completed a MD Order Sheet-Booking for Edward and ordered a lower bunk for him due to his age. She also ordered nursing to check Edward's vital signs three times per day and to refer any increased readings to a nurse practitioner, and to check his neurological status every six hours for the next 24 hours. She directed that Edward was to receive care for his wounds every day.

Szczepaniak noted that Captain Paradise ("Paradise") had spoken to Harris and learned that Edward was schizophrenic, non-complaint with medication, had a history of myocardial infarction (heart attack) and that his physicians were Roerich and Shah, a cardiologist. Both doctors were with Aurora Health Care.

Szczepaniak assigned Edward to Special Needs. She also referred him to an adult nurse practitioner for a medical history evaluation and to a psychiatric nurse practitioner for further evaluation. M. Grebner, M.D., ("Grebner"), the Jail medical director since 2002, approved the orders.[25] Grebner serves as the responsible health authority and, in that capacity, is responsible for reviewing and approving health care policies for the County, including

---

[25]At his deposition, Grebner compared the treatment afforded by Special Needs to that provided other facilities. The parties disagree on the content of his testimony. (*Compare* Defs.' PFOF ¶ 289, Pl's Resp. Defs.' PFOF ¶ 289.)

mental health policies. By his ethical code, Grebner is prohibited from divulging treatment details regarding a particular inmate to the Sheriff.

Special Needs is a horseshoe-shaped unit that contains 19 single inmate cells with glass doors. Each cell contains a bed, sink, toilet, and a glass door. Special Needs inmates have access to a dayroom, to the library, and to visitors.

Special Needs is designed so that two or three deputies can view each inmate from the central control section through glass. Deputies are at the control center 24 hours a day, seven days a week. The psychiatrist and the nurse practitioner can "eyeball" the inmates in Special Needs frequently.[26] (Defs.' PFOF ¶ 286, Pl.'s Resp. Defs.' PFOF ¶ 286.)

At 04:20, Edward was transferred to Special Needs. At 04:45, Szczepaniak called Harris because Edward's family would not be able to contact the nurses or Edward. Szczepaniak verified Edward's prescriptions and his current treating doctors so that she could contact them to obtain more accurate and detailed information regarding Edward's health.

Some time after arriving in Special Needs, Edward was evaluated by Troutman and Dunn. During Troutman's evaluation, he noted that Edward was "standing partially undressed in the cell," was having "auditory hallucinations," and was "thought blocking." (Pl.'s Add'l PFOF ¶ 29, Defs.' Resp. Harris's Add'l PFOF ¶ 29.)

The Inmate Psychiatric Assessment Progress Note completed by Troutman documents that he had obtained Edward's medical history from Harris over the telephone. The

---

[26]There is a factual dispute between the parties regarding whether Troutman and Dunn's offices were also in Special Needs. Although Harris did not respond to paragraph 283 of the Defendants' proposed findings of fact which states that Troutman and Dunn's offices were in Special Needs, paragraph 56 of her additional proposed findings of fact which states that "there were no medical personnel assigned in or to Special Needs" is in apparent conflict with the former statement.

history includes the facts that Edward had poor compliance with his medications, he refused food and did not sleep when decompensated, and he had auditory hallucinations. Edward's known medical problems were hypertension and myocardial infarction in 2003. Edward was also undergoing an evaluation for diabetes.

Troutman ordered that Edward be medicated with Benadryl 50 mg[27] IM (intramuscular) stat (at once), Lorazepam 2mg[28] IM stat, Haldol 10 mg[29] IM stat. Troutman also referred Edward for hypertension evaluation by a nurse practitioner. At about 07:30, Virginia Rechlicz RN ("Rechlicz") "was in with" Edward's medications. (Defs.' PFOF ¶ 74; Pl.'s Resp. Defs.' PFOF ¶ 74.)

At 09:19, the Jail received a seven-page fax from Bell with relevant psychiatric records regarding Edward's medical and psychiatric problems.[30] The last page indicated that Edward had received 25 mg (1 ml) IM Fluphenazine Dec on September 7 and September 28, 2004, and was due for another dose on October 19, 2004.

_____

[27]Benadryl is a brand name for diphenhydramine which is used to relieve red, irritated, itchy, watery eyes; sneezing; and runny nose caused by hay fever, allergies, or the common cold. Diphenhydramine is also used to relieve cough caused by minor throat or airway irritation. Diphenhydramine is also used to prevent and treat motion sickness, and to treat insomnia (difficulty falling asleep or staying asleep). Diphenhydramine is also used to control abnormal movements in people who have early stage parkinsonian syndrome (a disorder of the nervous system that causes difficulties with movement, muscle control, and balance) or who are experiencing movement problems as a side effect of a medication. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682539.html (last visited October 20, 2008).

[28]Lorazepam is used to relieve anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html (last visited October 20, 2008).

[29]Haldol is a brand name for haloperidol which is used to treat psychotic disorders and symptoms such as hallucinations, delusions, and hostility and to control muscular tics of the face, neck, hands, and shoulders. It is also used to treat severe behavioral problems in children and in hyperactive children (short-term use). http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682180.html (last visited October 20, 2008).

[30]There is a factual dispute between the parties regarding when the faxed Bell medical records were received by Troutman. (*See* Defs.' PFOF ¶ 75; Pl.'s Resp. Defs.' PFOF ¶ 75.)

24

At 09:51, in accord with Troutman's orders, Sergeants Coughlin and Wilcox,[31] and Deputy K. Jones ("Jones") placed Edward in a "Ripp Restraint Bed." (Defs.' PFOF ¶ 76; Pl.'s Resp. Defs.' PFOF ¶ 76.) At 10:12, Edward was given his injections. At 10:30, Edward was monitored for restraints and his vital signs, except for his temperature which he refused, were checked. At 12:15, Rechlicz checked on Edward, and at 12:30, Edward was monitored for restraints.

At 13:25, Rechlicz noted that Troutman ordered that the restraints be removed.[32] The restraints were removed from Edward. (Defs.' Master Ex. List ¶¶ 29 & 30, Ex. 29 (Jail Health Records) MCTY 0022, Ex. 30 MCTY 0656.) At 15:23, Nurse Tezra Jones ("Tezra") passed out medications. No refusals are noted. At 16:33, Edward was taken to booking. He came back from court at 17:12. At 19:50, Nurse Myra Lathrop ("Lathrop") and Pat Walton LPN ("Walton") distributed medications.

### Events of Saturday, October 1, 2004

Edward's blood pressure and temperature were taken at 01:00. Dunn performed a special management assessment noting that Edward's psychiatric symptoms were evident. She noted that he was psychotic, decompensating, and might require Chapter 51 proceedings.[33] Housing in Special Needs was still an appropriate choice.

---

[31] The cited underlying factual material does not include the given names of Coughlin or Wilcox. (*See* Defs.' Master Ex. List, ¶ 30, Ex. 30 (Redacted Jail Logs) MCTY 0655.)

[32] There is a factual dispute regarding whether Edward was checked hourly while he was in restraints as required by Milwaukee County Jail Policies and Procedures. (*Compare* Pl's Add'l PFOF ¶ 30, Defs.' Resp. Pl's Add'l PFOF ¶ 30.)

[33] Chapter 51 of the Wisconsin Statutes is the Mental Health Act. Section 51.20 of the Wisconsin Statutes provides for the involuntary commitment of an individual for mental health treatment.

25

While Dunn completed a Special Management Assessment form for Edward on October 1, 2004, there is no evidence that Dunn personally performed all aspects of that assessment on Edward. She testified that the form "was used to document report[s] that Dr. Troutman and/or I received from the deputies regarding the inmates condition on the evening and night shift. It was not a form used to document our personal observation of the inmate at that point in time." (Pl.'s Add'l PFOF ¶ 33, Defs.' Resp. Harris's Add'l PFOF ¶ 33.) Dunn checked the box that indicated that Edward was "Danger to Self or Others/Chapter 51." (Pl.'s Add'l PFOF ¶ 34, Defs.' Resp. Harris's Add'l PFOF ¶ 34.)

At 08:00, Dunn talked to Harris to determine that Edward's current medications were: Diovan 320 mg QD (daily), Zocar 80 mg QHS (at bedtime), Norvasc 10 mg[34] QD, Ecotrin ÷ QD, Coreg 25 mg BID (twice a day), Lasix 20 mg[35] QD. Because Edward was on such high doses of non-formulary drugs, a doctor was called to review and convert them. Grebner reviewed Edward's chart, converted his medications, and ordered the following medications for 14 days for Edward: Aspirin 325 mg daily; Atenolol 150 mg[36] daily; Verapamil SR[37] (slow release) 240 mg daily; Enalapril 20 mg[38] daily; Mevacor 80 mg[39] QHS;

---

[34]Norvasc is a brand name for amlodipine, which is used alone or in combination with other medications to treat high blood pressure and chest pain (angina). http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html. (last visited October 20, 2008).

[35]Lasix is a brand name of furosemide, a water pill. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html (last visited October 20, 2008).

[36]Atenolol is used alone or in combination with other medications to treat high blood pressure. It also is used to prevent angina (chest pain) and treat heart attacks. Atenolol is in a class of medications called beta blockers. It works by slowing the heart rate and relaxing the blood vessels so the heart does not have to pump as hard. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684031.html (last visited October 20, 2008).

[37]Verapamil is used to treat irregular heartbeats (arrhythmias) and high blood pressure. It relaxes your blood vessels so your heart does not have to pump as hard. It also increases the supply of blood and oxygen to the heart to control chest pain (angina). If taken regularly, verapamil controls chest pain, but it does not stop chest pain once it

Hydrochlorothiazide 25 mg daily. Edward was to be taken to the Critical Care Center if his blood pressure or lipids increased.

At about 13:45, Edward barricaded the door to sub-pod C while Deputy Irving ("Irving")[40] was in the sub-pod. Additional deputies under Coughlin's supervision escorted Edward to his cell and locked him in until he was stable. No force was used. At 15:39 and 19:55, Finch distributed medications and noted that there were no refusals.

**Events of Sunday, October 2, 2004**

At 00:40, a neurological assessment was performed to evaluate Edward in at least 14 different ways. At 01:11, Edward's blood pressure was checked.

A fax from Bell with Edward's records from 2003 was sent to Troutman.

At 07:40, Terza attempted to give Edward his medications, but he refused them and his breakfast. At 07:40, Edward refused a neurological assessment and, as a result, his vital signs could not be taken.

starts. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684030.html (last visited October 20, 2008).

[38]Enalapril is used alone or in combination with other medications to treat high blood pressure. It is also used in combination with other medications to treat heart failure. Enalapril is in a class of medications called angiotensin-converting enzyme (ACE) inhibitors. It works by decreasing certain chemicals that tighten the blood vessels, so blood flows more smoothly and the heart can pump blood more efficiently. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a686022.html (last visited October 20, 2008).

[39]Lovastatin is used together with lifestyle changes (diet, weight-loss, exercise) to reduce the amount of cholesterol (a fat-like substance) and other fatty substances in the blood. Lovastatin is in a class of medications called HMG-CoA reductase inhibitors (statins). It works by slowing the production of cholesterol in the body. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688006.html (last visited October 20, 2008).

[40]The cited underlying factual material does not include Irving's full name.

27

At 11:20, Nurse Jan Bergstrom was on the pod to distribute medications. Edward was listed as refusing them. At 11:30, Harris refused a neurological assessment and, as a result, his vital signs could not be taken.

At 15:25, LPN Jayna Cave ("Cave") distributed medications. Edward was not listed as a refusal. At 17:30, Cave attempted to give Edward his medications. He refused.

Some time during the evening, Cave performed a neurological assessment of Edward, evaluating him in at least 14 different ways.

### Events of Monday, October 3, 2004

At about 00:50 to 1:05, Russ Menhofter ("Menhofter") attempted to take Edward's vitals. Edward refused the blood pressure check believing he was at home and gave "a weird and threatening look." (Defs.' PFOF ¶ 102; Pl.'s Resp. Defs.' PFOF ¶ 102.)[41] At 02:04, supervisory rounds were performed by J. Callen, RN ("Callen").[42] At 06:38, Terza attempted to give Edward his medications. He was listed as a refusal. At 11:32, Terza distributed medications, Edward was not listed as a refusal. At 15:32 and 19:17, Cave distributed medications. No refusals are noted.

### Events of Tuesday, October 4, 2004

Edward was charged with a felony count of fleeing or eluding an officer and a misdemeanor charge of resisting or obstructing.

---

[41]Harris maintains that the correct date for this event is October 2, 2004.

[42]Harris maintains that the correct date for this event is October 2, 2004.

28

At 07:20, Rechlicz distributed medications. Troutman was at the Jail at about 11:00 and performed a special management assessment on Edward. He determined that Edward was not interacting well with his peers or authority, was withdrawn with psychiatric symptoms, and could not adequately care for himself. Troutman checked the boxes that indicated Edward was not adequately adjusting to Special Needs, did not understand his legal situation, did not understand his mental health problems, had evident psychiatric problems, was "withdrawn and anxious" and was a "Danger to Self or Others/Chapter 51." (Pl.'s Add'l PFOF ¶ 35, Defs.' Resp. Harris's Add'l PFOF ¶ 35.) Special Needs was still the appropriate housing for Edward.

Walton distributed medications at 15:34 and there were no refusals. At 19:30, Nursing Supervisor Stephen Ellison ("Ellison") toured the Jail. At 20:06, Walton passed out medications. Edward was listed as a refusal.

### Events of Wednesday, October 5, 2004

At 07:40, Nurse Dorothy ("Dorothy")[43] distributed medications. No refusals were noted. Troutman completed a special management assessment of Edward and noted that he was not adjusting to the pod, was withdrawn, and was manifesting psychiatric symptoms and decompensating. Edward was psychotic. Troutman checked the boxes on the Special Needs Assessment form that indicated Edward was not interacting well with peers or authority, did not understand his legal situation, did not understand his mental health problems, could not care for himself, and was "Danger to Self or Others/Chapter 51." In his progress notes,

_____

[43]The cited underlying factual material does not include Dorothy's full name.

Troutman observed that Edward was "catatonic" and "mute." (Pl.'s Add'l PFOF ¶ 37, Defs.' Resp. Harris's Add'l PFOF ¶ 37.) Troutman date-stamped the Bell report "October 5, 2004" and reviewed it. Troutman noted that the historical information he was relying upon was from the Bell medical records.

When asked, at his deposition, whether Edward's condition on October 5, 2004, was better or worse than it was on September 30, 2004, Troutman testified that it "hadn't changed." (Defs.' Master Ex. List ¶ 13, Ex. 13 59.)

At 10:25, Troutman ordered a shot for Edward. "Benadryl 25 mg IM stat, Haldol 10 mg IM stat." (Defs' Master Ex. List ¶ 29, Ex. 29 MCTY 0007.) At 10:40, Sergeant Wilcour ("Wilcour") attempted to speak to Edward without success.

At 11:08, Nurse Dorothy administered a Prolixin Decanoid shot to Edward. The Benadryl and Haldol were also ordered and given to Edward. At 11:09, a public defender saw Edward. At 11:20, Edward was returned to his cell without further incident.

The criminal action against Edward, Milwaukee County Case No. 04-CF-5596, was called for an initial appearance before Court Commissioner Grace Flynn ("Commissioner Flynn"). Edward did not personally attend the hearing. In requesting a competency evaluation under Wis. Stat. § 971.14, public defender Craig Johnson ("Johnson") informed Commissioner Flynn that Edward "was not able to respond to me in a coherent fashion and [was] causing difficulties for the bailiffs in terms of deputies trying to transport him and . . . they essentially picked him up and moved him physically even to get him outside his cell in the special needs to an area where you can attempt to have a discussion with him and it seemed he was unable

to move on his own power." (Defs.' Master Ex. List ¶ 23, Ex. 23 (Tr. Initial Appearance Milwaukee County Case No. 04-CF-5596) 2.) Commissioner Flynn ordered that Edward be evaluated regarding his competency to stand trial, and stated that the competency examination could take place outside the Jail. The Commissioner remanded Edward to the Sheriff for examination by a doctor. The court clerk noted that the doctor's report was to be "returned" to the court on October 19, 2004. (Defs.' PFOF ¶ 122, Pl.'s Resp. Defs.' PFOF ¶ 122.)

At 15:06, Nurse Charles Fitzgerald ("Fitzgerald") passed out medications. There were no refusals. At 17:10, Edward refused his dinner. At 19:38, LPN Blanca Orozco ("Orozco") distributed medications. Edward refused his medications.

### Events of Thursday, October 6, 2004

At 06:20, Edward was observed unresponsive and laying on the floor in a fetal position with his pants around his knees. Nursing staff and a sergeant were called to check Edward and to help him back to bed. Nurse Mary Hampel ("Hampel") evaluated Edward, taking his vital signs and clearing him medically. He would not lie down, but "remained in a sitting position on the side of the bed and off floor." (Defs.' PFOF ¶ 126, Pl.'s Resp. Defs.' PFOF ¶ 126.) She noted that he appeared to be eating poorly, and advised the deputies to provide milk and fruit since Edward apparently would eat those foods. At 06:30, two trays of old uneaten food were removed from Edward's cell.

Dunn performed a special management assessment on Edward noting that he was still not adjusting to the pod or complying with his medications. Edward was withdrawn/anxious, had physical problems, and was psychotic. On the Special Management

Assessment form, Dunn checked the boxes indicating that Edward was not interacting well with peers or authority, did not understand his legal situation, did not understand his mental health problems, could not care for himself, continued to decompensate, and was "Danger to Self or Others/Chapter 51." She noted that he was still appropriate to Special Needs. In her progress notes, Dunn wrote that Harris was sitting on the toilet and was mute.

Edward's medications were ordered as follows: "Give Prolixin Dec 50 mg IM today 10:40 a.m. AD. Then Prolixin Dec 50 mg IM Q 2 w[ee]ks x 30 d[ays], Prolixin 10 mg PO QHS x 7 days, then D/C." (Defs. PFOF ¶ 127.) The Prolixin shot was given.[44] Dunn noted that she had made telephone contract with Harris regarding Edward's condition.

At 07:35, Nurse Dorothy Greer ("Greer") distributed medications. There was no notation regarding any refusals.

At 10:35, Dunn checked on Edward and gave him an additional Prolixin Decanoid shot.[45]

At 16:10, Cave distributed medications. There were no refusals. But, at 19:39, when Cave again distributed medications, Edward refused his.

Sometime on October 6, 2004, Dunn thought that Edward was in a crisis situation.

---

[44]This statement is based on paragraph 127 of the Defendants' proposed findings of fact which is undisputed.

[45]This statement is based on paragraph 130 of the Defendants' proposed finding of fact which is undisputed.

32

## Events of Friday, October 7, 2004

At 02:10, Margaret Hoover RN ("Hoover") and Juanita Mesa ("Mesa") were in Special Needs to take Edward's vital signs. At 02:30, Hoover was called to the pod by a deputy because Edward was laying on the floor and disoriented. Hoover referred Edward to an adult nurse practitioner for evaluation of his psychiatric, hypertensive, and behavioral problems. Edward had an extremely high at-rest heart beat of 135, blood oxygen concentration of 87%, and swollen ankles. After this assessment was taken, appropriate measures were taken to facilitate Edward's transfer to Froedert for a more intensive medical evaluation.

At 03:05, Hoover returned to visually check Edward. At 05:30, Hoover checked on Edward. He was sitting on the floor of the cell and was uncooperative in her efforts to take his vital signs. Edward's feet were cold with edema.[46]

At 07:45, Greer was in the pod for medications. At 08:20, she attempted to give Edward his medications. Edward was sitting on the floor and refusing to talk. His head was down and he was staring. His skin was dry and warm and his feet had bilateral edema. Greer informed the nurse practitioner of her observations. The nurse practitioner said that she would speak to Grebner about having Edward evaluated at Froedert. Harris refused the Prolixin.

Dunn performed a special management assessment of Edward. He still had not adjusted to the pod, could not care for himself, and was not complying with his medications.

---

[46]Edema is a local or generalized condition in which the body tissues contain an excessive amount of tissue fluid. *Taber's Cyclopedic Medical Dictionary* 665.

On the Special Management Assessment form, Dunn checked the boxes indicating that Edward was not interacting well with peers or authority, did not understand his legal situation, did not understand his mental health problems, continued to decompensate, and was "Danger to Self or Others/Chapter 51." He had both physical and psychiatric problems and was psychotic even though he received Prolixin Decanoid 25 mg IM on September 28 and Prolixin Decanoid 50 mg on October 6, 2008.[47]

At 09:17, Edward was transported to Froedert, and a report was given to the emergency room staff. They were informed that the chief complaints were that Edward was non-compliant with medications and had hypoxia.[48]

At 13:15, Jail RN Spruill ("Spruill") received a telephone call from Coughlin indicating that Edward had been admitted to Froedert for treatment and that his psychiatric condition would be assessed. Coughlin indicated that he informed Harris of the same and gave Froedert the phone numbers where several of Edward's family members could be reached.

At 13:30, Froedert's Lisa Looney, RN, ("Looney") completed and signed the patient history profile noting that Edward had heart problems, high blood pressure and cholesterol, diabetes, and paranoid schizophrenia. His speech was clear, but she was unable

---

[47]This statement, based upon paragraph 140 of the Defendants' proposed findings of fact which is undisputed, is not consistent with the prior statements indicating that Edward was also given a Prolixin Decanoid shot on October 5, by Nurse Dorothy and that he was given two Prolixin Decanoid shots on October 6, 2004. However, Harris has not objected to paragraphs 116, 127, and 130 of the Defendants' proposed findings of facts. Therefore, pursuant to Civil Local Rule 56.2(e), the Court must conclude that there is no genuine material issue as to those proposed findings of fact.

[48]Hypoxia is defined as an oxygen deficiency in the body tissues or a decreased concentration of oxygen in inspired air. *Taber's Cyclopedic Medical Dictionary* 1057.

34

to complete the examination because he was uncooperative.  She noted that there were no signs of abuse or neglect.

Spruill called Froedert RN Lisa ("Lisa")[49] for an update and Lisa advised her to call back when the assessment was complete.  Spruill called Froedert at 15:45 and again spoke to Lisa who advised her that Edward was on telemetry with an initial diagnosis of rhabdomyopathy and that more labs and tests were needed.

At 15:45, Lisa described Edward as incoherent.

In response to a phone call from Harris's sister, Carolyn Jones ("Carolyn") to Clarke's secretary, the secretary requested that Singer call Carolyn.  Spruill noted that, at the request of Clarke's office, Singer had called Carolyn, informing her that at the time Edward was stable.  Spruill called Harris to reassure her that Edward was stable.

Charles E. Cady, M.D., ("Cady"), was the admitting physician at Froedert.  The impressions from a chest x-ray was taken in the emergency department, at 15:53, were: 1. no acute cardiopulmonary disease, 2. Significant subcutaneous air, lateral hemithorax and at the base of the neck, bilaterally.  No definite rib fractures or pneumothorax[50] was identified.  The Froedert records indicate that Edward was not responding to people and that the records provided by the Jail were reviewed.

A CT (computerized tomography) scan of the thorax without contrast disclosed: 1. Minimally displaced right anterior third rib fracture, 2. Extensive subcutaneous emphysema

_____

[49]The cited underlying factual material does not include Lisa's full name.

[50]Pneumothorax is the collection of air or gas in the pleural cavity.  *Taber's Cyclopedic Medical Dictionary* 1699.

Case 2:06-cv-00230-RTR   Filed 11/10/08   Page 35 of 79   Document 133

along the neck and chest, 3. minimal mediastinal emphysema, and 4. multiple calcified granulomata and apical paraseptal emphysema. No pneumothorax was noted.

Several diagnostic tests were performed and reviewed. The initial clinical impression was rhabdomyolosis[51] and schizophrenia. At Froedert, Drs. Amandeep Singh Gill ("Gill") and Nagendra Prasad Reddy ("Reddy") evaluated Edward and entered orders for his care. At 17:00, Edward was given a new bag of .45% NaCl (sodium chloride) solution 1000 ml with sodium bicarbonate 100mEq ("sodium chloride solution"). At 17:26, Edward was given two units of insulin. At 21:37, Edward was given two units of insulin and 40 mg of Lovenox (enoxaparin)[52] by injection.

At 22:30, Edward arrived at 4NW room number three. He was uncooperative and yelling. Shackles were on Edward's left leg and arm and a deputy sheriff was in the room. Medication was applied to an ulceration on Edward's left heel.

### Froedert Hospital - Saturday, October 8, 2004

At 00:20, Edward was unresponsive to questions and still shackled on his left arm and leg. Soft restraints were placed on Edward's right side. He was actively pulling at the intravenous lines. A deputy sheriff remained in the room. At 02:11, a new bag of sodium

---

[51]Rhabdomyolysis is the breakdown of muscle fibers resulting in the release of muscle fiber contents (myoglobin) into the bloodstream. Some of these are harmful to the kidney and frequently result in kidney damage. http://www.nlm.nih.gov/medlineplus/ency/article/000473.htm (last visited October 20, 2008).

[52]Enoxaparin is used to prevent blood clots in the leg in patients who are on bedrest or who are having hip replacement, knee replacement, or stomach surgery. It is used in combination with aspirin to prevent complications from angina (chest pain) and heart attacks. It is also used in combination with warfarin to treat blood clots in the leg. Enoxaparin is in a class of medications called low molecular weight heparins. It works by stopping the formation of substances that cause clots. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601210.html (last visited October 20, 2008).

chloride solution was delivered to Edward. At 04:40, Edward stated he was not in pain. The handcuffs and soft restraints were intact.

At 06:21, a new bag of sodium chloride solution was delivered to Edward. At 07:00, the insulin units were held per doctor's orders due to NPO (nothing by mouth) status. At 12:02, the insulin units were also held. An EEG (electroencephalogram) was normal with no epileptiform discharges. At 14:50 a CT scan of the head without contrast was performed. There was no indication of acute intracranial process. At 15:53, a 100-mg injection of thiamine[53] was given to Edward.

At 17:30, Edward refused dinner. No insulin was administered because dinner was refused. Edward's restraints were intact and a deputy sheriff was present. At 18:02, Edward refused insulin and food. At 21:14, Edward refused insulin.

### Froedert Hospital - Sunday, October 9, 2008

At 02:00, a 1-mg injection of Lorazepam was administered to Edward. It was noted that he was agitated. At 06:30, it was noted that Edward was upset that the deputy sheriff was at the door preventing people from entering and leaving Edward's room. Edward stated that he would not eat breakfast, so his insulin was held. At 07:00, insulin was held. Edward stated he would not be eating. At 09:00, a 100-mg injection of thiamine was administered. At 12:07, 1 unit of insulin was given to Edward. At 13:30, it was noted that

---

[53]Thiamine is involved in numerous body functions, including: nervous system and muscle functioning; flow of electrolytes in and out of nerve and muscle cells (through ion channels); multiple enzyme processes (via the coenzyme thiamin pyrophosphate); carbohydrate metabolism; and production of hydrochloric acid (which is necessary for proper digestion). Because there is very little thiamin stored in the body, depletion can occur as quickly as within 14 days. http://www.nlm.nih.gov/medlineplus/druginfo/natural/patient-thiamin.html (last visited October 20, 2008).

Edward was still refusing to eat. Edward denied experiencing any pain. His restraints were in place and a deputy sheriff was present. At 14:00, Edward refused one 10-mg tablet of amiodipine (Norvasc). At 17:22, insulin was held. Edward's fingerstick read 120. At that time, Edward refused the 25-mg tablet of carvedilol (Coreg). At 20:30, insulin was held. Edward refused to eat.

### Froedert Hospital - Monday, October 10, 2004

At 07:22, insulin was held. Edward's fingerstick was 122. At 07:34, Edward was given a 25-mg tablet of Coreg. At 09:00 Edward was given a 100-mg injection of thiamine. At that time, he refused to take the 10-mg tablet of Norvasc. At 13:00, Edward was given two units of insulin. His fingerstick was 180. He was essentially unchanged from prior documentation.

At 17:00, Edward refused the 25-mg tablet of Coreg. At about 17:17, his insulin was held. At 18:00, Edward's soft restraints and shackles to the bed were checked. Edward was refusing dinner but denied pain. At 21:00, insulin was refused. Edward refused to have a fingerstick. At 22:00, nursing staff noticed Edward was "tightly gripping foley and yelling at the top of his lungs." (Defs.' PFOF ¶ 181.) Ativan[54] was given and mitts were applied. At 22:10, a .1-mg tablet of clonidine[55] was given to Edward. At 22:12 a 1 mg injection of Lorazepam was given to Edward.

---

[54]Ativan is a brand name for lorazepam, which is used to relieve anxiety. *See* n. 28. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html#brand-names (last visited October 20, 2008).

[55]Clonidine is used to treat high blood pressure. It works by decreasing the heart rate and relaxing the blood vessels so that blood can flow more easily through the body. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682243.html (last visited October 20, 2008).

Case 2:06-cv-00230-RTR    Filed 11/10/08    Page 38 of 79    Document 133

## Froedert Hospital - Tuesday, October 11, 2004

Spruill from the Jail spoke with RN Melissa ("Melissa")[56] at Froedert who stated that Edward was stable and would not elaborate further because she was still assessing him. At 02:25, a 1-mg injection of Lorazepam was given to Edward. At 03:15, the restraints and shackles were checked and the mitts were removed from Edward because he was cooperative. A deputy sheriff was present in the room and emotional support was provided for Edward.

At 07:52, one unit of insulin and a 25-mg tablet of Coreg were given to Edward. At 09:00, Edward refused the 10-mg tablet of Norvasc. At 11:00, a 100-mg injection of thiamine was given intravenously. A new bag of .9% NaCl was hung. At 11:54, Edward was alert and talkative, but not responsive to questions. He was incontinent of stool. A deputy sheriff was at Edward's bedside. Edward's blood pressure was 200/103 and he was refusing Norvasc. The doctor was notified and would continue to monitor Edward's condition.

At 12:20, Edward's insulin was held. Edward's fingerstick was 116.

Notes from Bell's Clinical Coordinator, Alicia Mandolini, M.A., ("Mandolini") indicate that Troutman returned her telephone call and informed her that Edward had been transferred to a medical hospital due to changes in his physical status.

At 12:21, Edward refused 40-mEq tablet of potassium chloride SA. At 13:45, potassium chloride 20 mg mEq, lidocaine 10 mg in D5W 250 ml bag was delivered intravenously to Edward. At 14:00, the rate of .9% NaCl 1000 ml was changed to 75 ml /hr

---

[56]The cited underlying factual material does not include Melissa's full name.

and 100-mg thiamine was added. At 15:34, potassium chloride 20 mg mEq, lidocaine[57] 10 mg in a D5W 250 ml bag was administered intravenously to Edward.

At 06:08, Gill dictated the discharge summary noting the results of the CT scans of the head and thorax and that the electroencephalogram results were pending. The hospital course had been: 1. Elevated creatine kinase secondary to rhabdomyolysis after subcu emphysema secondary to rib fracture; 2. Schizophrenia; All psych meds were held due to the possibility of neuroleptic malignancy syndrome;[58] and, 3. Relatively new rib fracture without pain. The discharge diagnosis was: 1. Right rib fracture; 2. Schizophrenia; 3. Congestive heart failure; 4. Hypertension; and, 5. Diabetes mellitus. Edward was to be on a diabetic diet.

At 17:00, Dr. Marsh Wright ("Wright") wrote that Harris said she would approve an NGT (nasogastric tube) if doctors felt it was necessary to give Edward fluids, food or medications. At 17:27, Edward refused the 25-mg tablet of Coreg. At 17:28, he refused insulin. At 18:21, a 1-mg injection of Lorazepam was given to Edward. At 18:45, Edward was alert but talking "nonsensically." (Defs.' PFOF ¶ 201.) He was refusing all oral medications. A deputy sheriff was in the room. Edward's appetite was good. He ate all his dinner. Monitoring continued. At 21:31, Edward refused insulin. His fingerstick was 224. Froedert caseworker Rita L. Beckman ("Beckman") noted that "per MD, patient is waiting

---

[57]Lidocaine is an local anesthetic.
*See generally* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682701.html (last visited October 20, 2008).

[58]Neuroleptic malignant syndrome is a life-threatening, neurological disorder most often caused by an adverse reaction to neuroleptic or antipsychotic drugs. Symptoms include high fever, sweating, unstable blood pressure, stupor, muscular rigidity, and autonomic dysfunction. In most cases, the disorder develops within the first 2 weeks of treatment with the drug; however, the disorder may develop any time during the therapy period. http://www.ninds.nih.gov/disorders/neuroleptic_syndrome/neuroleptic_syndrome.htm (last visited October 20, 2008).

40

for psych consult for increasing paranoia. Patient is planned to return to Milwaukee House of Corrections when medically stable. Awaiting psych input." (Defs.' PFOF ¶ 203.)

### Froedert Hospital - Wednesday, October 12, 2004

At 00:52, Edward was given a 1-mg injection of Lorazepam. At 02:15, Edward was alert, confused and restless. Soft restraints were in place and a deputy sheriff was at his bedside. Edward's heart rate was irregular and "tacky." (Defs.' PFOF ¶ 205.) Emotional support was provided.

At 07:03, Edward was given two units of insulin. His fingerstick was 189. Edward was given a 25-mg tablet of Coreg. Another dose of Coreg was due at 17:00.

Beckman noted that Edward would return to the Jail that day with follow-up by psychiatry in Jail. She phoned the House of Correction Behavioral Psych Unit to assure that treatment was available. Froedert was to call the Jail doctor with its report.

At 09:00, Edward was given a 100-mg injection of thiamine. At that time, Edward refused the 10-mg tablet of Norvasc.

At 11:30, Edward was alert, talking out loud, and not making sense. His wrist restraints and shackles were checked. A small one cm skin breakdown on his heel was noted. The doctor was notified. Edward's heart rate was irregular, breath sounds were down bilaterally, and pedal pulses were down. The pressure ulcer on his right side of undetermined etiology was improved.

Case 2:06-cv-00230-RTR   Filed 11/10/08   Page 41 of 79   Document 133

At 11:55, labs were drawn.  At 12:00, the hematology report was generated with several readings above or below normal.  It was noted that Edward had a slight hemolysis.[59] At 12:00, Edward was given one unit of insulin. His fingerstick was 149.  Insulin was due to be administered again at 17:00.

At 12:15, Replicare dressing was placed on Edward's left heel.  A physical assessment flow sheet documenting Edward's progress from October 7, through October 12, 2004, shows that several neuromuscular, cardiovascular, and respiratory signs remained abnormal  through October 12, 2004.

At 14:40, Diana Schick, R.N. ("Schick") completed and signed the discharge summary stating "All Expected Outcomes Met."   The discharge diagnosis was right rib fracture, schizophrenia, DM (diabetes mellitus), CHF (congestive heart failure), increased CK (creatine kinase) secondary to rib fracture.  No incisions or wounds were noted.  No other pertinent findings or pain management needs were noted.  Edward's speech was impaired and garbled and he was rambling nonsense.  Edward was to follow-up with the Jail psychiatry unit and his personal physician.

During Edward's stay at Froedert, he fluctuated from a catatonic state to an agitated state.  Edward remained at Froedert until he began to eat on October 12, 2004.  He was then immediately discharged to the Jail.

Gill had examined Edward and noted that the rhabdomyolysis had improved due to intravenous hydration.  The psychosis had still not improved.  Edward was afebrile, his

---

[59]Hemolysis is the destruction of red blood cells. *Taber's Cyclopedic Medical Dictionary* 969.

Case 2:06-cv-00230-RTR   Filed 11/10/08   Page 42 of 79   Document 133

pulse was 106, blood pressure was 157/97, rate was 22, oxygen saturation was 97%. The plan was: "Discharge to jail in care of jail psychiatrist. Check BNP [beta-natriuretic peptide] and CK prior to discharge to ensure normalizing trend (Required am blood draw.)" (Defs.' PFOF ¶ 218.)

Edward was discharged from Froedert at 15:00 by Schick. His medications on discharge were Zocar 80 mg QHS, Diovan 320 mg QD, Norvasc 10 mg QD, Coreg 25 mg BID, Lasix 20 mg QD, Prolixin Decanoid 25 mg Q3weeks. His temperature was 97 degrees, pulse 82, rate 20, and blood pressure 162/88. His speech was garbled and nonsense.

At 15:30, it was noted that Edward was discharged to the Jail with two deputy sheriffs who were given the discharge papers. Edward was uttering paranoid objections during the removal of the intravenous lines and Foley catheter. A report was given to the Jail nursing staff.

At 18:01, Edwards returned from the hospital and was placed in Special Needs at Paradise's direction. It was possible that Edward would be housed in the infirmary, but the Jail was awaiting instructions from Troutman and Grebner. "Discharge meds per medical director review. J Rezlaff." (Defs.' PFOF ¶ 221.) At 18:09, it was noted that Troutman ordered a shot for Edward. "Ativan 2mg IM x 1" and "Zydis 10mg[60] PO x 1" were ordered and given. (Defs.' PFOF ¶ 222.) At 18:15, an injection was administered to Edward without

---

[60]Zydis is a brand name for olanzapine which is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions). It is also used to treat bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). Olanzapine is in a class of medications called atypical antipsychotics. It works by changing the activity of certain natural substances in the brain.
 http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601213.html (last visited October 20, 2008).

incident. It was noted that Paradise had directed that Edward was to be monitored closely and that if he calmed down, he was to be moved to the infirmary. The medications as ordered were given by Joanne Rezlaff, R.N., ("Rezlaff"). At 19:25, Rezlaff brought Edward his oral medications. At 20:44, Walton was on the pod for medication distribution. There is no notation that Edward refused any medications.

At 21:10, Edward was moved from Special Needs to the infirmary, cell 11. The infirmary is down the hall from Special Needs. The infirmary has 11 individual cells, a dayroom, and a deputy control center. Edward was sedated and calm, but still confused. Edward was sitting in the corner of his cell talking to himself.

At 21:12, Lathrop noted that Edward had numerous diagnoses including a rib fracture, paranoid schizophrenia, congestive heart failure, myocardial infraction in 2003, hypertension, hypercholesterolemia, and diabetes mellitus. Edward was sitting on the floor of the infirmary yelling. A mattress was placed on the floor but Edward would not lie on it. Grebner was aware that Edward was in the infirmary for "sub-acute d/t fx rib." (Defs.' PFOF ¶ 226.) At 21:20, nursing supervisory rounds were performed by Joe R. Piccoine RN ("Piccione"). Rounds in the infirmary were performed at 22:45, 23:15, 23:45.

### Events of Thursday, October 13, 2004

"Medical visit plus meds." (Defs.' PFOF ¶ 229.) Grebner saw Edward for the first time since his arrest and booking. Grebner noted that Edward "appears preoccupied with internal stimuli." (Pl.'s Add'l PFOF ¶ 51, Defs.' Resp. Harris's Add'l PFOF ¶ 51.) Grebner discontinued the Zocor, Norvasc, Prolixin Decanoid, and ordered 14 day prescriptions of

44

Mevacor 80 mg QHS, Verapamil SR 240 mg, Atenolol 150 mg daily, and Enalapril 20 mg daily. "FS BID."  Grebner referred Edward to a nurse practitioner for a history of increased blood sugar at Froedert.  Grebner also indicated that Edward's blood pressure should be monitored and "refer/hx HD [heart disease]/ [Froedert]."  (Defs.' PFOF ¶ 229.)  Grebner also ordered 325-mg of aspirin daily for 14 days.  Grebner's notes of his examination list Edward's multiple chronic problems and his history of medical noncompliance.  Grebner noted numerous areas of superficial skin breakdown that were likely due to Edward's long contact with the floor, nutritional deficits, and underlying chronic diseases.  Grebner noted that, at Froedert, Edward was found to have elevated creatine phosphokinase but that neuroleptic malignant syndrome was considered unlikely.  Grebner indicated in the long run psychiatric placement would be more reasonable than jail.  (Defs.' Master List ¶ 29, Ex. 29 MCTY 0012.)

Troutman received a phone call from Dr. Aaron Dall ("Dall") of Froedert regarding Edward's diagnosis of rib fracture, subcutaneous emphysema, and elevated creatine phosphokinase.  Troutman examined Edward.[61]  Troutman noted that he had prescribed Zydis because of the questionable diagnosis of neuroleptic malignant syndrome.  He ordered "Zydis 10 mg ÷ p.o. stat then ÷ p.o. BID" for 14 days.  (Defs.' PFOF ¶ 230.)  The order was noted by Janise Johnson RN ("Johnson").

At 00:15, rounds were performed in the infirmary.  Five minutes later Edward's

---

[61] The Defendants' proposed finding of fact, which is undisputed, includes a statement that Troutman prescribed Ativan on October 13, 2004.  (Defs.' PFOF ¶ 230; Pl.'s Resp. PFOF ¶ 230.)  However, the underlying cited material indicates that the drug was prescribed on October 12, 2004.  (Defs.' Master List ¶ 29, Ex. 29 MCTY 0068.)

bed was moved from cell 11 and placed in the hallway outside the infirmary per Pamela Bottonia RN ("Bottonia"). Between 00:45 and 4:15 rounds were conducted at 30-minute intervals.

At 04:00, Bottonia took Edward's vital signs noting that he had multiple pressure sores on the left ankle and right elbow, gurgly breathing, and was not taking fluids. Bottonia noted that Grebner would be addressing those issues and evaluating Edward regarding his diabetes. Bottonia washed the pressure sores with Betadine and covered them with a dressing. Edward was incontinent of stool, so his diaper was changed. Bottonia noted that Edward had congestive heart failure and noted that the doctor would address its status. Bottonia's plan was to raise the issue with the doctor the following day. (Defs.' Master Ex. List ¶ 1, Ex. 1 12.)

At 04:48, Sergeant Micheal J. Renolski ("Renolski") toured the infirmary. At that time, Bottonia and RN Menhoster ("Menhoster")[62] checked Edward's vital signs, applied Depends, and cleaned his wounds. At 05:00, Bottonia noted that the supervisor was aware of the situation and the need of a bed since it was difficult to change Edward while he was on the floor. She took Edward's vital signs and noted that his lungs were gurgly. Bottonia was so concerned about Edward's condition that she stayed two hours past the time her shift ended to care for him.

At 05:15, 05:45, 06:00, 06:30, and 07:00 rounds were performed in the infirmary. At 07:00, medical staff members assisted Edward from the floor and placed him in a chair. Edward now required one-on-one care and was fed by staff who encouraged fluid

---

[62]The cited underlying record does not provide Menhoster's full name.

intake. It was noted that Edward was evaluated by a psychiatric doctor and by Grebner in the infirmary. Troutman prescribed Zydis 10 mg twice daily. The morning dose of Zydis was given. Grebner assessed Edward's lungs and edema. Lathrop noted that Edward spoke to people who were not there, and he was verbally and physically abusive to staff, gripping them tightly.

Rounds in the infirmary were made at 07:12, 07:28, and 07:50. Tony Rubio ("Rubio"), Barb Stehlow ("Stehlow"), Lathrop, and Dyzon Numan ("Numan") assisted in placing Edward in a wheelchair.[63] At 08:23, Troutman came to the infirmary to see Edward. At 08:35 and 09:00, rounds were performed in the infirmary. At 09:30, Edward was dozing in his wheelchair in the day area waiting for staff to shower him. It was noted that he was incontinent of bowel and bladder. A clean diaper was applied. At 09:35 and 10:00, rounds were performed in the infirmary.

At 10:00, Edward was taken from the infirmary to court. He returned to the infirmary at 10:19. At 10:42, Edward was seen by Robert Rawski, M.D. ("Rawski"), a board certified general and forensic psychiatrist. At 10:47, 11:08, 11:40, and 12:00 rounds were performed in the infirmary. A supervisory tour was performed at 12:30. At 12:30, it was noted that Edward was unable to eat because he had no teeth and that Jail staff was unable to verbally or tactilely arouse Edward.

---

[63]There is a factual dispute regarding the time that Edward was placed in the wheelchair. (*Compare* Defs.' PFOF ¶ 238; Pl.'s Resp. PFOF ¶ 238.) The Defendants assert that 08:01 is the correct time whereas Harris maintains 07:35 is the correct time. Regardless, either time advocated by the parties would have Edward in the wheelchair before Troutman saw him on October 13, 2004.

Infirmary rounds were performed at 12:33 and 13:03. At 13:10, staff assisted Edward with a shower. It was noted that Edward was more alert but still incontinent of bowel and bladder. Edward was given a carton of Resource to increase hydration. He was given a second carton of Resource that ended up on the floor. It was noted that Edward constantly talked to himself saying "God Damm." Rounds of the infirmary were performed at 13:30, 14:20, and 14:45.

At 14:56, Edward was taken to "CIV," returning to the infirmary at 15:12. At 15:45, Edward was in the dayroom sleeping soundly. His vitals were fingerstick 264, blood was 106/72, "68, 14, and 98%." (Defs.' PFOF ¶ 248.) Edward did not respond when his vital signs were taken by D. Roehm, RN ("Roehm"). Rounds were conducted at 15:25, 16:12, 16:45, and 17:15.

At 17:20, staff attempted, unsuccessfully, to feed Edward dinner. He would not swallow when food was placed in his mouth and kept yelling. It was noted that staff would offer him Resource later. Rounds of the infirmary were conducted at 17:48, 18:20, 18:53, 19:19, 19:32, 20:05, and 20:20.

At 20:30, Roehm placed Edward back in his bed. She noted he refused Resource and medical attempts twice and continued yelling but he did not attempt to climb out of bed. At 21:05, 21:25, 21:49, 22:12, 22:18, 22:45, and 23:15, rounds were performed in the infirmary. At 23:24, deputies assisted the nursing staff in getting Edward into bed. Rounds were made at 23:45.

**Events of Friday, October 14, 2004**

Medications ordered were "Lasix 20 mg po qd x 14 days, Resource TID Prn x 30 days." *(*Defs.' PFOF ¶ 254.) At 00:15 and 00:45, rounds were made in the infirmary. At 01:00, Edward was repositioned in bed. Between 01:15, 01:45, 02:15, 02:45, rounds were performed in the infirmary. At 03:08, Mesa performed a supervisory round. At 03:15, 03:45, 04:15, and 04:45 rounds were performed in the infirmary.

At 04:50, Sharon Penister, RN, ("Penister") visited Edward. At 05:00 it was noted that Edward had slept for half an hour and was talking to himself while in bed. He remained dry. At 05:15, 05:45, 05:55, 06:40, 07:00, and 07:30 rounds were made in the infirmary. At 07:53, Edward required care for his incontinence. His buttocks were checked for sores and Lathrop, John RN ("John")[64] and "Med. Tech." Greg Rubia ("Rubia") lifted Edward into a wheelchair and fed him by hand. Edward's food and fluid intake were monitored and encouraged. Medications were given. At 08:00 rounds were performed in the infirmary.

At 08:18, Edward's vital signs were taken and he finished his breakfast. Grebner reviewed Edward's status and ordered a blended diet that could be supplemented with Resource. Edward's medications were given to him in the morning. He refused the Mevacor.

Beginning at 08:30 through 12:30, rounds of the infirmary were made every 30 minutes on the hour and half hour. At 12:15, it was noted that a lunch tray was kept available for Edward. At 12:30, Lathrop noted that Edward had been asleep in a chair since breakfast

_____

[64]The cited underlying record does not include John's full name.

49

and she was unable to wake him. She notified Troutman of Edward's increased sedation and Troutman placed a 24-hour hold on the Zydis. It is noted that Edward's medications would be evaluated. At 12:48, Lathrop attempted to feed Edward but he would not wake up.

At 13:00, 13:30, 13:58, 14:30, 14:59, 15:30, and 16:00 rounds were performed in the infirmary. At 16:00, Finch took Edward's vital signs and noted that he was awake and had small emesis. He also noted that Edward had numerous skin tears on both arms.

At 16:28, rounds were performed. At 16:30, Finch checked on Edward. At 16:55, rounds were performed. At 17:00, Finch noted that Edward was alert but he was refusing food.

Rounds were performed at 17:26, 17:59, 18:07, 18:30, 19:00, and 19:26. At 20:00, Finch noted that Edward continued to be up in the wheelchair. Edward was quiet for a while and then verbal and swearing. At 20:05, Piccione performed supervisory nursing rounds. At 20:06 and 20:30 rounds of the infirmary were made.

At 20:35, Edward was assisted from the wheelchair to the bed by Piccione, Sergeant Richard Graeber ("Graeber"), and Finch. Edward was alert but confused. Edward was placed on his side with a wedge pillow behind his back. At about 20:45, Finch observed Edward partially sitting up. Ten minutes later, Finch noted that Edward appeared unconscious.

Master control was notified to send medical assistance and additional deputies. Graeber, deputies Robert Camury ("Camury"), Todd Rosenstein ("Rosenstein"), Gotschalk[65] ("Gotschalk"), Pamela Moats ("Moats"), Brandon Rios ("Rios"), Brian Morgan ("Morgan"),

---

[65]The underlying cited record does not include Gotschalk's full name.

and Piccione and Paradise responded within minutes. Finch, Piccione, Nurse Dyson Nann ("Nann") and Rosenstein began CPR and used an AED defibrillator machine until the arrival of the Milwaukee Fire Department ("Fire Department"). At 21:03, Fire Department Engine #20 arrived and took over CPR. At 21:05, Fire Department Med #7 arrived. At 21:06, Edward was pronounced dead at Froedert.

At 21:30, Detective Theodore Robinson ("Robinson") arrived on the scene to investigate. Rios had taken control of the entry door and was keeping a record of all persons on the scene.

### Rawski's Report

On October 19, 2004, as ordered by Court Commissioner Flynn, Rawski filed his report with Milwaukee County Circuit Court Judge Jeffrey A. Cohen ("Cohen") regarding his October 13, 2004, evaluation of Edward. Rawski concluded:

> I believe to a reasonable degree of medical certainty that the defendant, Edward . . . , is suffering from a severe exacerbation of **Undifferentiated Schizophrenia**. Consistent with past decompensations, [Edward] has become catatonic, paranoid, agitated and mute. He has also become hostile and aggressive, requiring admission of medications against his will to prevent dangerous behavior.

(Defs.' Master Ex. List, ¶ 21, Ex. 21 2.) Rawski opined that there is "ample documentation that this current episode is consistent with past episodes and that appropriate treatment, when instituted, does result in an improvement to the degree that he would likely become competent to stand trial." (Defs.' Master Ex. List, ¶ 21, Ex. 21 3.)

Case 2:06-cv-00230-RTR   Filed 11/10/08   Page 51 of 79   Document 133

The Jail could not have transferred Edward to another mental health treatment facility until a court order was issued requiring the transfer. A court will not order the transfer until they receive a psychiatrist's evaluation. Rawski performed his initial evaluation pursuant to the court order.

Rawski had no concerns regarding whether the Jail staff could provide appropriate medical and psychiatric care to Edward from the time of Rawski's examination of Edward to the time that the court would make a decision on treatment.[66]

Rawski's report indicates that Edward had continued to decompensate and "that he had been receiving treatment in the . . . Jail and for a brief time at Froedert . . . for nearly two weeks without much improvement." (Defs.' Master Ex. List ¶ 21, Ex. 21 3.) When Rawski evaluated Edward he was "slumped over" in a wheelchair, did not respond to verbal stimulation, and required one-on-one supervision. (Pl.'s Add'l PFOF ¶ 58, Defs.' Resp. Harris's Add'l PFOF ¶ 58.) Rawski's report reflects that the Jail staff expressed concern to him about Edward's level of decompensation and "his length of stay prior to hospitalization." (Pl.'s Add'l PFOF ¶ 61, Defs.' Resp. Harris's Add'l PFOF ¶ 61.) They "asked that [he] do his part to expedite communication about [his] opinion in this matter." (Pl.'s Add'l PFOF ¶ 61, Defs.' Resp. Harris's Add'l PFOF ¶ 61.)

At his deposition, Rawski testified that he was so concerned about Edward's condition that he expedited his competency report. He also testified that at the time of his evaluation, Edward met the criteria for involuntary commitment under Chapter 51 of the

_____

[66]The parties dispute whether Rawski had any concerns about Edward's treatment or condition when Rawski saw him on October 13, 2004. (*Compare* Defs.' PFOF ¶ 295; Pl.'s Resp. PFOF ¶ 295.)

Wisconsin Statutes. When asked whether he had any concerns on why Edward had presumably not improved for the 13 or 14 days he had been at the Jail and Froedert, Rawski testified "I attribute it to a severe episode that had yet to be sufficiently treated." (Defs.' Master Ex. List ¶ 8, Ex. 8 50.)

Troutman was asked whether he disagreed with Rawski's statement that Edward had been receiving treatment in the Jail and for a brief time at Froedert for nearly two weeks "without much improvement" and Troutman answered "no." (Defs.' Master Ex. List ¶ 13, Ex. 13 119.) Troutman was asked whether he disagreed with Rawski's recommendation that Edward be transferred to one of the state psychiatric institutes for the purposes of restoring his competency to stand trial and Troutman said "no." (Defs.' Master Ex. List ¶ 13, Ex. 13 122.)

### Post-Death Investigation

The State of Wisconsin Department of Health and Family Services Original Certificate of Death for Edward, signed on October 28, 2004, lists the cause of death as natural. The immediate cause of death was a pulmonary embolism.

On October 29, 2004, the County Medical Examiner's Autopsy Report ("Autopsy Report") was completed and signed by Jeffery M. Jentzen M.D. ("Jentzen"). It listed the cause of death as pulmonary embolism. Other significant conditions noted were congestive heart failure and arteriosclerotic heart disease. The contusions noted in the report were on the right hand "second metacarpophalangeal," a healing superficial abrasion on the upper left arm, and superficial dried abrasions on the left-hand fifth finger.

53

The matter was investigated by Jon N. Reddin ("Reddin"), Country Deputy District Attorney. After speaking with Jentzen, examining Jail reports, and conducting additional interviews, Reddin concluded that Edward died of natural causes and was given prompt medical attention.

Mandolini, Clinical Coordinator for Bell, wrote a letter dated October 25, 2004, to Michael Kalonic ("Kalonic")[67] praising Troutman for his courteous, responsive, and professional manner in which he interacted with Edward.

Troutman testified that treating a paranoid schizophrenic like Edward was a time-consuming process and that best treatment is one that is done slowly, deliberately and without drastic medication changes for fear of additional adverse results.

### Dr. Kenneth I. Robbins

Kenneth I. Robbins, M.D., ("Robbins") is a board certified psychiatrist and doctor of internal medicine, who serves as a Clinical Associate Professor of Psychiatry at the University of Wisconsin-Madison and the Medical College. Robbins found no evidence to suggest that Edward was treated with deliberate indifference during his incarceration. Robbins is of the opinion that Edward received appropriate psychiatric care in the Jail and was promptly transferred to Froedert when psychiatric problems endangered his health.

### Dr. Daniel Spitz

Daniel J. Spitz, M.D., ("Spitz") is a licensed forensic pathologist, who evaluated the records regarding Edward. In Spitz's opinion, Edward died very rapidly of natural causes,

---

[67]Kalonic was the Jail Administrator. (*See* Defs.' Master Ex. List ¶ 13, Ex. 13 (Troutman Dep.) 18.)

Case 2:06-cv-00230-RTR   Filed 11/10/08   Page 54 of 79   Document 133

secondary to a pulmonary embolism due to lower extremity deep vein thrombosis,[68] all asymptomatic during his incarceration. It is Spitz's opinion that Edward's pulmonary embolism was a very sudden and unforeseeable event and that there is no evidence that the medical care or treatment that Edward received from the Jail staff contributed to his death.

### Dr. Daniel J. Kennedy

Daniel J. Kennedy, Ph.D., ("Kennedy") is a professor of criminal justice at the University of Detroit, Michigan. He holds a Ph.D. in Educational Psychology and a M.A. and a B.A. in Sociology from Wayne State University. In Kennedy's opinion, none of the Jail staff, including the named defendants acted with deliberate indifference to Edward during his stay in the Jail.

### Jackson

Harris named Jackson as a medical witness in her expert disclosure filed with this Court on March 1, 2007. Harris submitted Jackson's report dated February 27, 2007, to the Court. Jackson filed a second report on January 15, 2008.

Jackson's report states that he has been hired to discuss the cause of death and the medical care received by Edward at the Jail. Jackson is a licensed psychiatrist in Wisconsin. Jackson also opined that Harris has reactive depression, anxiety, and insomnia as the result of the loss of her husband and her struggle to understand why he was not provided adequate care.

---

[68] A thrombosis is the formation or presence of a blood clot within the vascular system. *Taber's Cyclopedic Medical Dictionary* 2182.

Case 2:06-cv-00230-RTR   Filed 11/10/08   Page 55 of 79   Document 133

### Lynne Thaxton

Harris named Lynne Thaxton, RN ("Thaxton"), as a nursing expert in her witness disclosure filed March 1, 2007. Thaxton filed a report. Thaxton filed a second report dated November 25, 2007, on January 15, 2008. Thaxton is a registered nurse in Wisconsin and South Carolina. Thaxton was deposed on May 17, 2007, and on March 20, 2008. Thaxton testified that her opinions were limited to the nursing care given to Edward at the Jail. Thaxton has never had a case involving an incarcerated individual and has never been to the Jail.

At her first deposition, Thaxton testified that her only concern was the open areas on Edward's left foot and ankle, which she believed were caused by the restraints used at Froedert. At her second deposition, Thaxton testified that she was concerned that Edward was not forced to take his medications while incarcerated.

Thaxton opined that the Jail nursing staff failed to notify the physician that Edward had refused three consecutive doses of medications as required by County Correctional Health Care Policy Bates stamped MCTY 1347 and the nursing standard of practice. (Defs.' Master Ex. List ¶ 11, Ex. 11D 1.) She also opined that the nurse practitioner failed to evaluate Edward for hypertension, contrary to Troutman's orders and the nursing standard of practice. (Defs.' Master Ex. List ¶ 11, Ex. 11D 2.) Thaxton also opined that the Jail nursing staff violated the nursing standard of practice and County Correctional Health Care Policy Bates stamped MCTY 1329 and MCTY 1405 on September 30, 2004, by not properly monitoring his condition while Edward was in restraints. (Defs.' Master Ex. List ¶

11, Ex. 11D 2.)  She also noted that there was no documentation in the record regarding the need for restraint or that a physician's order for the need for restraints had been obtained. (Defs.' Master Ex. List ¶ 11, Ex. 11D 2.)

Thaxton also noted that on October 7, 2004, at 02:30 when the nurse found that Edward had a heart rate of 135 at rest, the finding should have been reported to the physician immediately.  (Defs.' Master Ex. List ¶ 11, Ex. 11D 2.)  However, the nurse deferred reporting the finding until 08:20 and Edward was not sent to the hospital until 09:30 – a delay of seven hours contrary to the standard of nursing care.

## Harris

Harris testified that she did not have any physical illnesses as a result of her grief over Edward's death.  She missed two weeks of work following the news of his death and was paid for that missed time.  She did not witness the alleged harm to her husband.  Rather, Harris heard about it later from her family friend.[69]

## Grebner

Consistent with his October 13, 2004, progress note that stated in the long run psychiatric placement would be more reasonable than jail, Grebner testified that Edward "was not going to learn anything from being in jail.  It was not going to modify his behavior in the future.  So as far as I am concerned, it would be a – it would be necessary to have him not on the streets." "  (Defs.' Master Ex. List ¶ 5, Ex. 5 (Grebner Dep.) 33.)  Grebner further stated that "So my feeling was, there's not much point, and it's very expensive to keep somebody in

---

[69]The Defendants object to Harris's additional proposed findings of fact paragraphs one through seven.

Case 2:06-cv-00230-RTR   Filed 11/10/08   Page 57 of 79   Document 133

jail. Better to say this is a mental health problem. He should be in a mental health setting. It's a philosophical vent is what it is." (Defs.' Master Ex. List ¶ 5, Ex. 5 33-34.) Grebner also testified that the jail does not "control how the [C]ounty chooses to fund mental health. So we do the best that we can in what we can control, and this is provide the best available service in the [J]ail." (Defs.' Master Ex. List ¶ 5, Ex. 5 40.) Grebner made Clarke aware of the difficulties the Jail had with attempting transfers to Behavioral Health that resulted in the Jail becoming the "de facto provider of mental health services." (Pl.'s Add'l PFOF ¶ 66, Defs.' Resp. Harris's Add'l PFOF ¶ 66.) Grebner summarized Clarke's response as stating that "one plays with the hand that one is dealt. That we don't control how the [C]ounty chooses to fund mental health. So we do the best that we can in what we control, and that is provide the best available service in the [J]ail." (Defs.' Master Ex. List ¶ 5, Ex. 5 33-34.) Grebner did not have a conversation with Clarke that was specific to Edward.

Grebner testified that the Jail developed new policies and procedures in part due to a consent decree entered into in a class action lawsuit filed on behalf of inmates, *Christensen v. Sullivan*, Milwaukee County Case No. 96-C-1835 ("*Christensen action*"). Grebner has both anecdotal and personal knowledge of the type of care that would be given to a patient at Behavioral Health in 2004, in part because many of their staff and the Jail staff transfer between the two entities.

## Training

The County implemented new health policies and procedures, in part the *Christensen* action and resulting consent decree, including mental health policies and procedures. Johnson and Szczepaniak testified that they had not been trained on the health policies and procedures that relate to mental health. There is factual dispute between the parties regarding whether Singer, the nurse educator from 2002 through July or August 2004, trained the nursing staff on the health policies or procedures that relate to mental health. (*Compare* Pl.'s Add'l PFOF ¶¶ 98-99, Defs.' Resp. Harris's Add'l PFOF ¶ 98-99.)

Janice Rose ("Rose") was the nurse educator at the Milwaukee House of Correction from 2000 through 2004, and at the Jail from 2003 through 2004. She testified that she did not train the nursing staff on the health policies or procedures that relate to mental health.

## *ANALYSIS*

Brown, Dickerson, Trimboli (the "Officer Defendants"), Clarke, and the County assert Harris's claims against them should be dismissed because she cannot prove deliberate indifference or even negligence on the part of the Officer Defendants. Second, they maintain that, assuming the Officer Defendants' conduct was in fact negligent, they have immunity for any alleged improper conduct. Third, they contend that there is no evidence that the Officer Defendants, or Milwaukee County failed to establish appropriate policies or procedures or that the Officer Defendants were insufficiently trained. Troutman, Dunn, Szczepaniak, and Singer (the "Medical Defendants") maintain that Harris cannot prove deliberate indifference against

59

them. In addition, they contend that assuming that they were negligent, they are immune from liability.

Harris maintains that Brown, Dickerson, and Trimboli were deliberately indifferent to Edward during the traffic pursuit, stop and arrest because they made no effort to ascertain whether they were dealing with an emotionally disturbed person for the purpose of determining that he needed hospitalization, and that they ignored his medical needs when they transported him to the Jail booking room, and failed to convey his treatment to Szczepaniak. She also maintains that Clarke has personal liability because Clarke failed to act on information about Edward to ensure that he received constitutionally adequate medical care. She also asserts that the Defendants are not entitled to immunity. Harris also contends that Milwaukee County was deliberately indifferent to Edward's medical and mental health needs because members of the Jail staff were not adequately trained and that Clarke is liable as a supervisor because he failed to take any steps to make certain that adequate policies and procedures were developed and implemented. Harris also maintains that Singer has supervisory liability because she breached her supervisory duty to ensure that the Jail staff was adequately trained. With respect to the medical personnel, Harris maintains that they were deliberately indifferent to Edward's medical and mental health needs. She also asserts that they not entitled to immunity.

### Deliberate Indifference to Medical Needs

Although the Eighth Amendment only applies to convicted prisoners, that the same standard applies to pretrial detainees under the Fourteenth Amendment's due process

60

clause. *Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007). Under this standard, "plaintiff has the burden of showing that (1) the harm to the plaintiff was objectively serious; and (2) that the official was deliberately indifferent to [his] health or safety." *Id.* (quoting *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003)).[70]

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (citation omitted). A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Prison officials act with deliberate indifference when they act "intentionally or in a criminally reckless manner." *Tesch v. County of Green Lake*, 157 F.3d 465, 474 (7th Cir. 1998). Neither negligence nor even gross negligence is a sufficient basis for liability. *See Salazar v. City of Chi.*, 940 F.2d 233, 238 (7th Cir. 1991). A finding of deliberate indifference requires evidence "that the official was aware of the risk and consciously disregarded it nonetheless." *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001) (citation omitted).

A difference of opinion among physicians cannot support a finding of deliberate indifference. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (citing *Garvin v. Armstrong*, 236 F.3d 896 (7th Cir. 2001)); *Estate of Cole v. Fromm*, 94 F.3d 254, 261 (7th

---

[70]As noted in *Williams*, 509 F.3d at 403, the Fourteenth Amendment protections only apply to a pretrial detainee's confinement conditions after he received a judicial determination of probable cause. Claims regarding pretrial conditions of confinement for pretrial detainees who have not yet had a judicial determination are instead governed by the Fourth Amendment and its objectively reasonableness standard. *Id.*; *see also Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007). However, no Fourth Amendment violation is alleged; therefore, the Court has evaluated Harris's § 1983 claims under the Fourteenth Amendment as plead.

61

Cir. 1996)). Deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment. *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1999); *Fromm*, 94 F.3d at 261-62.

### Brown, Dickerson, and Trimboli

With respect to Harris's deliberate indifference claim against Brown, Dickerson, and Trimboli because they did not know or obtain the history of Edward's mental health problems and previous law enforcement encounters which resulted in either involuntary confinement or judicial findings of not guilty by reason of mental disease or defect, the record establishes that the officers believed that they were pursuing an intoxicated driver. Moreover, while Trimboli indicates that she did not run a background check on Edward because she was not the arresting officer, Harris has produced no evidence indicating that the officers were required to run a background check as a part of the arrest process.

Dickerson does not recall whether Edward appeared intoxicated at the time of his arrest. Despite construing the facts and reasonable inferences from those facts in the light most favorable to Harris, Dickerson's participation in the pursuit and his presence at the scene of the arrest are, as a matter of law, insufficient to provide a basis upon which a reasonable jury could find that he was aware that Edward had a mental health problem or other serious medical need or that he was deliberately indifferent to any such need. There is no evidence

that Dickerson had any other involvement in the circumstances surrounding Harris's claim. Therefore, Harris's Fourteenth Amendment claim against Dickerson is dismissed.

Harris's claim against Trimboli is analogous to her claim against Dickerson. As with Dickerson, Trimboli participated in the chase and arrest of Edward. At the time of his arrest, she did not smell alcohol on Edward. However, Trimboli also did not believe that Edward was a danger to himself or others. While she administered angle kicks to Edward's abdomen because he resisted arrest, Harris has presented no evidence that Trimboli knew or should have known that Edward had a serious medical need. Indeed, while a relatively new rib fracture without pain was diagnosed at Froedert on October 11, 2004, there is no evidence indicating when the rib was fractured. Edward also refused emergency medical services which were available at the scene of his arrest. Viewed in the light most favorable to Harris, the evidence does not provide a basis upon which a reasonable jury could find that Trimboli was deliberately indifferent to a serious medical need of Edward. She did not convey Edward to the Jail and had no further involvement with Edward. Therefore, Harris's Fourteenth Amendment claim against Trimboli is dismissed.

With respect to Brown, he participated in the pursuit of Edward, was present at the scene of the arrest when Trimboli used the abdominal kicks, he also conveyed Edward to the Jail for booking. Upon Edward's arrest, Brown did not detect the use of drugs or the odor of intoxicants and at the time of Edward's arrest, Brown did not believe that Edward was a danger to himself or others. Brown conveyed Edward to the Jail and during that process concluded that Edward was an emotionally disturbed person. It is undisputed that Brown did

not tell that to Szcezpaniak during the booking process. However, Brown testified that to him the term meant that the person does not have the capacity to function in a normal setting. Based on the information known to Brown and his usage of the term emotionally disturbed, no reasonable jury could conclude that he should have known that Edward had an objectively serious mental health need.

With respect to the use of force during the arrest, there is a factual dispute regarding whether Brown told Szcezpaniak about the use of force during Edward's arrest. Regardless of that dispute, Brown's knowledge that force had been used against Edward is not tantamount to knowledge that he had a serious medical need. Brown also knew that at the scene, medical care had been offered to Edward and that he had refused. There is insufficient evidence upon which a jury could find that Brown was aware of the risk to Edward and consciously disregarded it nonetheless. *Chapman*, 241 F.3d at 845.

### Szczepaniak

Harris asserts that Szczepaniak ignored Edward's medical and mental health needs because she did not obtain an adequate psychiatric history for Edward, she failed to ensure that Edward was immediately provided with intensive psychiatric care, and she failed to obtain or request information from Brown regarding Edward's mental and physical condition when Brown brought Edward to the Jail for booking.

The issue as to Szczepaniak is whether Harris has produced sufficient evidence upon which a jury could reasonably find that she was deliberately indifferent to Edward's

medical and mental health based on her involvement in the booking process on September 29, and 30, 2004. Her recognition of the serious nature of his needs is not contested.

A underlying theme of Harris's claim against the Medical Defendants is that they should have placed him in a facility where he could have received intensive psychiatric care. However, the Court is mindful that in most cases managing correctional facilities is not a job for the federal courts. *See Scarver v. Litscher*, 434 F.3d 972, 976-77 (7th Cir. 2006) (officials at the Wisconsin Secure Program Facility did not unconstitutionally subject homicidal schizophrenic inmate to cruel and unusual punishment, absent evidence that they knew the conditions of confinement, i.e.; heat, constant illumination, and lack of sound, were making his mental illness worse.") The court of appeals has admonished that "The Constitution rarely requires 'the best.' That would imply the micro-management of American government by the federal courts. The Eighth Amendment forbids cruel and unusual punishments; it does not require the most intelligent, progressive, humane, or efficacious prison administration." *Anderson v. Romero*, 72 F.3d 518, 524 (7th Cir. 1995).

The record discloses that upon Edward's arrival at the Jail on September 29, Szczepaniak's attempts to obtain a medical history from Edward were impaired by his lack of communication. However, she conducted an initial medical screening to ascertain his physical condition. The minor physical examination was performed due to privacy concerns. She identified Edward's need for placement in Special Needs and made arrangements for him to be seen by an adult nurse practitioner for a medical history evaluation and by a psychiatric

nurse practitioner for further evaluation. Szczepaniak also learned of Edward's psychiatric history

as related by Harris to Paradise. By 09:19 on September 30, the Jail had received Edward's treatment records from Bell. While Harris suggests that Szczepaniak should have done more to obtain an adequate psychiatric history for Edward, obtained immediate psychiatric treatment for him, and obtained information from Brown, a difference of opinion about medical care does not constitute an Eighth Amendment violation. *Norfleet*, 439 F.3d at 396. Harris is seeking a specific treatment for Edward and that is not provided for by the Eighth Amendment. *See Forbes v. Edgar*, 112 F.3d 262, 266-67 (7th Cir. 1997). Because the record does not provide a basis upon which a jury could reasonably conclude that Szczepaniak was deliberately indifferent to Edward's medical needs, Harris's Fourteenth Amendment claim against her is dismissed.

### *Troutman*

Harris maintains that Troutman ignored Edward's medical and mental health needs because he failed to ensure that an adequate psychiatric history for Edward was obtained; he did not review the Bell's records until October 5, 2004; despite Edward's deteriorating condition, he did not properly modify Edward's medications; and he failed to adequately attend to Edward and to ensure that Jail mental staff members adequately attended to Edward. Harris maintains that despite his knowledge that Edward had been laying on the floor of his cell for extended periods of time, Troutman took no action to see that this did not occur. She also maintains that despite his knowledge of Edward's decompensation, severe

catatonia, and the fact that he and Jail staff identified him as a danger to himself and others, Troutman failed to ensure that Edward was provided with constitutionally adequate health care – intensive psychiatric care that would have aborted his decompensation and restored Edward to some modicum of competency.

Harris disagrees with various aspects of Troutman's treatment of Edward. However, disagreement with the treatment provided does not establish an Eighth Amendment violation. *Norfleet*, 439 F.3d at 396. Troutman indicates that treatment of a paranoid schizophrenic like Edward is a time-consuming process and that the best treatment is done slowly, deliberately and without drastic medication changes for fear of additional adverse results.

Construing the evidence in the light most favorable to Harris, Troutman did not review Edward's medical records until October 5, 2004. However, the record also suggests that the medical records were not forwarded to Troutman until October 3, 2004. Even if the records were available to Troutman on September 30, 2004 and he did not review them until October 5, 2004, Troutman may have been negligent, but more than negligence is required to violate the Eighth Amendment. *See Salazar*, 940 F.2d at 238.

Harris's contention that Troutman did not properly modify Edward's medications reflects her disagreement with the treatment provided. However, the medical records reflect that on October 5, 2004, Troutman ordered psychiatric medications for Edward. Edward was at Froedert from late on October 7, through about 15:00 on October 12, 2004. Thereafter, on October 13, 2004, Troutman changed Edward's psychiatric medication because

of the concern that Edward had neuroleptic malignancy syndrome. Deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment. *Fromm*, 94 F.3d at 261-62.

The medical records indicate frequent contacts by Troutman and other medical staff with Edward on the days that he was at the Jail. Troutman saw Edward on Thursday September 30. According to Troutman's schedule, he was not at the Jail from October 1, through October 3, 2004. Dunn worked on Friday, October 1, and she evaluated Edward and spoke with him. On October 2 and October 3, Edward was seen by members of the nursing staff. On October 4 and October 5, Troutman performed a special management assessment of Edward, and Edward was seen by members of the nursing staff. On October 5, Troutman ordered medications for Edward. On October 6, 2004, Dunn performed a special management assessment of Edward, ordered medication, and opined that he was in a crisis situation. On October 6, nursing staff also saw Edward. On October 7, 2004, nursing staff made multiple observations of Edward. Dunn also performed a special management assessment of Edward. Based on Edward's medical status, he was transferred to Froedert where he remained until the afternoon of October 12, 2004, when he was discharged from the hospital and returned to the Jail.

Upon Edward's return to Special Needs, Troutman ordered a shot for Edward. About three hours later, Edward was moved to the infirmary, where he remained until he died

68

on October 14.  On October 13, Troutman examined Edward, and Edward was seen multiple times by the nursing staff.  On Friday, October 14, Edward was frequently seen and assisted by the nursing staff.  Grebner reviewed Edward's medical status and ordered a change in his diet.  Troutman was also notified of Edward's sedation and ordered a 24-hour hold on Edward's psychiatric medication.

The records also reveal that Troutman monitored Edward's medical condition and adjusted his medication as needed.  Troutman testified that as far as he is concerned Special Needs is the hospital and he serves as the treating doctor for those inmates.

Harris also states that although Troutman knew that Edward had been laying on the floor of his cell for extended periods of time, Troutman took no action to see that this did not occur.  Actions were taken by Jail medical staff to  reposition Edward on a mattress when he was found sitting on the infirmary floor on October 12.  He was also moved from the floor to a chair on October 13.   In addition to the extent restraints could have been used to prevent Edward from laying on the floor, an inmate has both an Eighth Amendment right to be restrained so that he would not injure himself and a Fourteenth Amendment right to be free from restraint.  *See Sanville v. McCaughtry*, 266 F.3d 724, 736 (7th Cir. 2001).

Harris also maintains that despite Troutman's knowledge of Edward's decompensation, severe catatonia, and the identification of him as a danger to himself and others, Troutman failed to ensure that Edward was provided with constitutionally adequate health care  –  intensive psychiatric care that would have aborted his decompensation and restored Edward to some modicum of competency.  Troutman's constitutional obligation was

adequate treatment for Edwards's mental health condition. A plaintiff does not have a constitutional right to the treatment of his choosing. *Anderson*, 72 F.3d at 524. The evidence and the reasonable inferences from that evidence do not provide a basis for a reasonable jury to conclude that Troutman was deliberately indifferent to Edward's serious medical and mental health needs.

In addressing the adequacy of the medical care provided, Harris relies on four decisions of other courts of appeal. (*See* Pl.'s Resp. Br. 9.) Two of the decisions, *Westlake v. Lucus*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)[71] and *Tolbert v. Eyman*, 434 F.2d 625, 626 (9th Cir. 1970),[72] predate the Supreme Court's November 30, 1976 decision in *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To the extent these decisions remain relevant in light of the subsequent case law development, *Westlake*, 537 F.2d at 860 n.5, states:

> We distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment. *See Fitzke v. Shappell*, [468 F.2d 1072,] at 1076 n. 4 [(6th Cir. 1972]). *See also Jones v. Lockhart*, [482 F.2d 1192,] at 1194 (8th Cir. 1973); *Corby v. Conboy*, [457 F.2d 251,] at 254 [(2d Cir. 1972)]. Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law. *See e.g., Pinon v. Wisconsin*, 368 F.Supp. 608 (E.D.Wis.1973). *But cf. Fitzke v. Shappell*, *supra* at 1076-77 n. 7. Of course, in some cases the medical attention rendered may be so woefully

---

[71]*Westlake*, 537 F.2d at 861, held that a pretrial detainee stated a Fourteenth Amendment claim based on allegations that jail authorities denied him medical treatment for a bleeding ulcer.

[72]*Tolbert*, 434 F.2d at 625, held that the allegation in a state prisoner's complaint that a prison physician had scoffed at the prisoner's complaint of eye trouble did not establish for purposes of a motion to dismiss that the prisoner had been given an eye examination.

> inadequate as to amount to no treatment at all. *See Tolbert v. Eyman*, 434 F.2d 625, 626 (9th Cir. 1970).

Edward certainly received treatment in this case – the dispute is over its adequacy.

*Hathaway v. Coughlin*, 37 F.3d  63, 69 (2nd Cir. 1994), held a jury could infer deliberate indifference where an inmate was kept waiting for two years before being evaluated for surgery to abate chronic pain in his hips and, for one year during that time, the doctor failed to inform the inmate that there were broken pins in his hip or to discuss the option of surgery. The circumstances presented by Edward's treatment are not analogous to those of *Hathaway* – non-disclosure is not an issue and, although Harris believes Edward could have received better medical treatment in a different facility, Edward received reasonably prompt and diligent medical treatment.

Harris also cites *Comstock v. McCrary*, 273 F.3d 693, 708 n.5 (6th Cir. 2002), for the proposition that "a prison doctor's medical response to an inmate's serious need may constitute deliberate indifference just as readily as the intentional denial or delay of treatment." (quoting *Estelle*, 429 U.S. at 104-05).  The court held that the prison psychiatrist's defense hinged whether his actions constituted "an inadvertent failure to provide adequate medical care," *Estelle*, 429 U.S. at 105, "or a reasonable response to a known risk to the inmate's health and safety. *Farmer* [*v. Brennan,*] 511 U.S. [825,] at 834 [(1994)], both of which would entitle him to qualified immunity." *Comstock*, 273 F.3d at 707.

In this case, despite construing the evidence in the light most favorable to Harris, the Court concludes that Troutman provided a reasonable response to the known risks to Edward's health and safety.

71

*Dunn*

Harris's contentions with respect to Dunn are similar to those regarding Troutman. She maintains that Dunn failed to ensure that an adequate psychiatric history of Edward was obtained, and that she timely obtained and reviewed Edward's mental health records, and that despite the fact that the medications were not improving Edward's condition she did not properly modify those medications to abort the decompensation. She also maintains that despite Dunn's knowledge that Edward had been lying on the floor of his cell, Dunn took no actions to ensure that this did not occur. She also claims that despite Dunn's knowledge of Edward's decompensation, severe catatonia, and the fact that she and others at the Jail had identified him as a danger to himself and others, Dunn failed to ensure that Edward was provided with constitutionally adequate medical care.

The record establishes that Edward's medical records from Bell were obtained by September 30, 2004, and were available to Dunn. Dunn spoke with Harris on October 1, 2004. Dunn evaluated Edward's condition on October 6, 2004, and ordered Prolixin for him which was administered. On October 6, 2004, Greer, a nurse, informed the nurse practitioner, presumably Dunn, of Edward's medical condition. The nurse practitioner told Greer that she would speak to Grebner about having Edward evaluated at Froedert. Dunn also contacted Harris that day regarding Edward's condition. On October 6, 2004, Dunn felt that Edward was in crisis. Dunn again evaluated Edward again on October 7, 2004. Edward was hospitalized at Froedert between October 7, until the evening of October 12, 2004. The record suggests that Dunn helped trigger Edward's transfer to Froedert for treatment and stabilization.

There is no evidence of contact between Dunn and Edward while he was in the infirmary. However, the record for that time period demonstrates that Edward received frequent medical attention from Troutman, the psychiatrist, and from other medical personnel.

Harris also asserts that although Dunn knew Edward was lying on the floor, she took no actions to prevent this from occurring. The medical records reflect that on October 6, 2004, Edward was lying on the floor at 06:20. However, Dunn was not working at that time. On October 7, 2004, Edward was sitting on the floor while Dunn was working. After talking with Greer about Edward's medical condition, the nurse practitioner talked to Grebner about having Edward transferred to Froedert. According to the medical records, within an hour, Edward was transported to Froedert. The evidence and the reasonable inferences from that evidence do not support Harris's contention that Dunn did not intervene when Edward laid on the floor. Despite viewing the evidence and the reasonable inferences from it in the light most favorable to Harris, a reasonable jury could not find that Dunn was deliberately indifferent to Edward's serious medical and mental health needs.

## Singer

Harris also contends that Singer and the Jail nursing staff ignored Edward's medical and mental health needs. Harris relies, in part, upon the contact between Edward's sister, Jones, and Clark. She asserts that, after being informed of the situation, Singer failed to ensure that Edward was either provided additional treatment at the Jail or transferred to a psychiatric facility for constitutionally adequate mental health care.

The evidence relating to Carolyn is limited. The only evidence is that at the request of Clarke's secretary, on October 7, 2004, Singer called Carolyn informing her that Edward was stable. Harris has not presented evidence of the information, if any, conveyed by Carolyn. Additionally, from October 7, through the evening of October 12, 2004, Edward was being treated at Froedert. Upon Edward's return to Special Needs and, then, upon his transfer to the infirmary, the evidence documents frequent nursing contact and care, including one-on-one care. The evidence indicates that as Edward's medical needs increased, he received increased nursing attention. On October 14, 2004, nurse supervisors checked on Edward twice during the early morning hours. He was lifted into a wheelchair and fed. His food and fluid intake were encouraged. Frequent rounds were made. Lathrop advised Troutman of Edward's increased sedation prompting Troutman to order a 24-hour hiatus on that medication. Finch, a nurse, checked on Edward at 16:00, 16:30, 20:00, and assisted him to bed at 20:35. Finch also observed Edward at 20:45, and found him unconscious ten minutes later. Finch alerted others for assistance.

Harris also asserts that the repeated negligent acts of the Jail nursing staff illustrate a pattern of negligent conduct on the part of the Jail medical staff. She asserts that Edward was not seen by a Jail physician until the day before he died, Jail staff failed to notify a physician that Edward had repeatedly refused medication, failed to evaluate Edward for hypertension, failed to obtain a physician's order to place Edward in a restraint bed, failed to properly monitor him, and failed to notify a physician of Edward's extremely rapid heartbeat and distress on October 7, 2004.

In support of this contention, Harris cites *French v. Owens*, 777 F.2d 1250, 1254 (7th Cir. 1985), which involved an appeal from a court order requiring extensive reforms at the reformatory at Pendleton, Indiana. The court found that the medical neglect of prisoners violated the Eighth Amendment. The district court found the facility was "severely understaffed." *Id*. There was a single physician to handle 190 requests for medical care each day. *Id*. There was only one full-time physician who spoke little English. *Id*. Inmates in need of medical help got between one and ten minutes each for evaluation and treatment. *Id*. The court also noted that there were numerous instances of neglect, misdiagnosis and maltreatment, indicating that one patient had tuberculosis that went undiagnosed, another had a broken back that went untreated, and a third had an abscessed rectum that went unattended for six months. *Id*. *French* did not involve the treatment of a single patient.

Harris also relies upon *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983). That action involved repeated instances of negligent medical care together with general systemic deficiencies. Two of the three physicians were recent immigrants whose English language skills were insufficient to allow them to communicate effectively with the prisoners, and the position of staff psychiatrist had been unfilled for two years – with the consequence that there was no one qualified to evaluate and treat psychiatric emergencies or to follow patients who needed to be maintained on long-term psychotropic medications. *Id*. at 272-73. There were also many instances of medical maltreatment involving the denial of medical treatment of an inmate's stomach problems for two years, an inmate's abscess for five years, and an inmate's dental problem for two years. *Id*. at 273. This was also combined with the

failure to treat an inmate complaining of chest pains, until nine hours after the inmate had alerted prison personnel to his chest pain. There were also ongoing an severe problems in the stocking of needed medical supplies. *Id.* at 274. The circumstances of this case are not analogous to those of *Wellman*.

Despite construing the facts and reasonable inferences from those facts, in the light most favorable to Harris, this Court concludes that a reasonable jury could not find that Singer was deliberately indifferent to Edward's medical needs. Therefore, Harris's Fourteenth Amendment claim against Singer is dismissed.

*Clarke*

Harris's claims include the contention that Clarke played a personal role in Edward's incarceration. As jail commander, Clarke presumptively was not involved in Edward's medical treatment at the jail. *See Duncan v. Duckworth*, 644 F.2d 653, 656 (7th Cir. 1981) (prison superintendent not personally involved in day-to-day operation of the institutional hospital, and not responsible for treatment decisions). The evidence in the record shows that Carolyn contacted Clarke's secretary to inquire about Edward's medical status. Construing this evidence in a light most favorable to Harris, that evidence is insufficient to support the inference upon which the jury could reasonably find that Clarke was personally involved with Edward's medical treatment.

Supervisory liability will be found only if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it. That is, to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct.

Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. In other words, they must act either knowingly or with deliberate, reckless indifference. *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (citations and quotation marks omitted). There is no evidence that Clarke was personably involved in the medical care afforded to Edward from September 29, through October 14, 2004. Therefore, Harris's Fourteenth Amendment claim against Clarke in his individual capacity are dismissed.

### Qualified Immunity

All the individual defendants contend that they are entitled to qualified immunity. However, because each of the individual defendants are entitled to summary judgment on Harris's Fourteenth Amendment claim, it is not necessary to address their qualified immunity argument. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997).

### Municipal Liability & Failure to Train

Harris's Fourteenth Amendment claims against the County and Clarke, as a policymaker, rely upon *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691 (1978) and *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). However, the government as an entity is responsible "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. There must be a direct causal link

between the alleged unconstitutional deprivation and the municipal policy or custom at issue. *City of Canton*, 489 U.S. at 385. There are limited circumstances when "failure to train" may be a basis for municipal liability under § 1983. *Id*. at 388.

However, a failure to train theory or a failure to institute a municipal policy requires a finding that the individual officers are liable on the underlying substantive claim. *Tesch*, 157 F.3d at 477. Since this Court has found that the individual defendants did not inflict a constitutional injury on Edward, the County and Clarke cannot be held liable to Harris. *See id.* Therefore, neither the County nor Clarke have any *Monell* liability under Section 1983, and such claims against them are dismissed.

*Supplemental Claims*

Harris also asserts state law negligence claims against Clarke, Troutman, Szczepaniak, Brown, Dickerson, Trimboli, Dunn, and Singer; and claims for loss of society and companionship and for negligent infliction of emotional distress. The Defendants assert that such claims may be subject to dismissal based on immunity pursuant to Wisconsin law, relying upon Wis. Stat. § 893.80(4). Harris opposes the contention maintaining that Wis. Stat. § 302.38 and Wis. Admin. Code. DOC § 350.09 created a ministerial duty to provide appropriate care and treatment to prisoners. In their reply brief, the Defendants also argue that Harris cannot prove her claim for emotional distress.

Generally, when a court resolves all federal claims before trial, it should dismiss supplemental claims without prejudice. *Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir.

2007). In the exercise of its discretion, this Court declines to exercise jurisdiction over Harris's state law claims and they are dismissed without prejudice.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

Harris's third claim against Pope-Harris for negligence is **DISMISSED**;

The Defendants' motion for summary judgment (Docket No. 112) is granted as to the Fourteenth Amendment claims arising out Edward's confinement as a pretrial detainee from September 29, 2004, until October 14, 2004, and those claims are **DISMISSED** with prejudice;

Harris's supplemental state law negligence claims against Clarke, Troutman, Szczepaniak, Brown, Dickerson, Trimboli, Dunn, and Singer, and her claims for loss of society and companionship and for negligent infliction of emotional distress are **DISMISSED** without prejudice;

The Defendants' motion to exclude Jackson's testimony (Docket No. 114) is **GRANTED**;

This action is **DISMISSED**;

The Clerk of Court is **DIRECTED** to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 10th day of November, 2008.

**BY THE COURT**

*s/ Rudolph T. Randa*

**Hon. Rudolph T. Randa**
**Chief Judge**